IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TIFFANY NEAL,

    *Plaintiff*,

    v.

                            Civil Action No. ELH-19-1033

UNITED STATES OF AMERICA,

    *Defendant*.

**MEMORANDUM OPINION**

Plaintiff Tiffany Neal, a disabled U.S. Army veteran, filed a tort suit against the United States of America (the "Government"), pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*. ECF 1 (the "Complaint"). The suit arises from events that occurred in 2017, while Neal was a patient at the Veterans Affairs Medical Center ("VA") in Baltimore. In particular, plaintiff claims that a male employee of the VA ignored a knock-before-entering sign, entered the examination room while plaintiff was partially disrobed and undergoing a medical procedure, and thereafter made inappropriate telephone calls to her.

The Complaint contains two counts, titled as follows: "Professional Negligence – Vicarious Liability" (Count 1) and "Intrusion Upon Seclusion – Privacy Violation" (Count 2). In actuality, Count 1 contains an amalgam of claims. For example, ¶ 36 alleges that Lewis breached the standard of care for a cardiology technician, and ¶ 37 alleges negligent supervision, hiring, and training by the VA.

The Government previously moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1), asserting sovereign immunity on the ground that the employee did not act within the scope of his employment. ECF 9 (the "Motion to Dismiss"). And, under Rule 12(b)(6), it moved to dismiss Count 2, the privacy claim, for failure to state a claim. *Id*. By Memorandum Opinion

(ECF 14) and Order (ECF 15) of November 27, 2019, I granted the Motion to Dismiss as to Count 1 with respect to Neal's claims of sexual assault and negligent hiring, training, and supervision, and granted the motion as to Count 2 to the extent Neal relied upon the claim of sexual assault. But, I denied the Motion to Dismiss as to the remainder of Neal's claims.

The Government answered (ECF 16), and the parties thereafter engaged in discovery.[1] Following the conclusion of discovery, the Government moved for summary judgment (ECF 33), accompanied by a memorandum (ECF 33-1) (collectively, the "Motion") and exhibits. ECF 33-2 to ECF 33-14. Neal opposes the Motion. ECF 38 (the "Opposition"). She has also submitted exhibits, many of which are the same as those submitted with the Motion. ECF 38-1.[2] The Government has replied. ECF 45 (the "Reply").

In addition, by Order of January 3, 2022 (ECF 46), the Court requested briefing from counsel as to the applicability of *Lins v. United States*, 847 Fed. App'x 159 (4th Cir. 2021) (per curiam), with respect to the negligent supervision claim.[3] The Government's submission is at ECF 49, and Neal's submission is at ECF 50.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion in part and deny it in part. And, I shall revive plaintiff's negligent supervision claim.

---

[1] Discovery was originally scheduled to conclude by May 22, 2020. *See* ECF 18 at 1. But, it did not conclude until March 26, 2021, in part due to the impact of the COVID-19 pandemic. ECF 30.

[2] All of Neal's discovery exhibits are contained in one ECF document.

[3] Although *Lins* was decided in February 2021, well before the briefing concluded as to the Motion, counsel did not address *Lins* in their briefing.

# I.     Factual Background

## A.  The Alleged Incidents

Neal, who was born in 1981, is a disabled, retired veteran of the United States Army, having served between 1999 and 2004.  ECF 33-11 (Pl.'s Answer to Def.'s Interrogs.) at 3, 4; ECF 33-12 (Neal Depo.) at 3 (Tr. at 9-11).  Her disabilities include Crohn's disease, avascular necrosis, and tachycardia.  *Id*.

On August 7, 2017, Neal went to the VA for an echocardiogram.  ECF 33-1 (exam report); ECF 33-3 at 6 (Neal's first witness statement).[4]  The procedure took place in an exam room at the VA, and was conducted by a cardiac sonographer, Leteria Poole.  ECF 33-2 at 1; ECF 33-3 at 6, 10; ECF 33-12 at 4 (Tr. at 14-15).  A sign on the door of the exam room asked entrants to knock before entering.  ECF 33-3 at 6, 10 (Poole witness statement); ECF 33-12 at 5 (Tr. at 18).

Because of the nature of the procedure, Neal was required to remove her shirt and bra, and to instead wear a robe that left her front exposed.  ECF 33-3 at 6, 10; ECF 33-12 at 4 (Tr. at 15-16); ECF 38-1 at 51 (Tr. at 10-11).  Neal then laid down on a table in the room while Poole performed the procedure.  ECF 33-12 at 5 (Tr. at 17); ECF 38-1 at 51 (Tr. at 10).  Neal testified, and reported in her witness statement to the VA police, that her breasts were exposed during this time.  ECF 33-3 at 6; ECF 33-12 at 5 (Tr. at 17-18), 6 (Tr. 21).  Poole, however, has testified that she placed a towel over Neal's breasts, and that Neal's breasts were not exposed at the time.  ECF

---

[4] An echocardiogram is an ultrasound of the heart.  *See Echocardiogram*, Nat'l Library of Medicine Medline Plus, https://medlineplus.gov/ency/article/003869.htm (last updated May 8, 2021). The VA exam report specifies that Neal's visit was for a transthoracic echocardiogram. ECF 33-1 at 1. At various points in the briefing, the parties also refer to the procedure as an ultrasound or an electrocardiogram, which is a different kind of test. An electrocardiogram is sometimes referred to as an "ECG" or "EKG."

38-1 at 51 (Tr. at 10-11), 58-59 (Tr. at 41-42), 60 (Tr. at 46).  A privacy curtain separated the door from the table.  ECF 33-3 at 6, 10; ECF 33-12 at 5 (Tr. at 17).

During this procedure, a male VA employee, Grant Lewis, entered the room.  ECF 33-3 at 6, 10, 13 (Lewis's first witness statement); ECF 33-12 at 5-7 (Tr. at 18-26).  Lewis was, at the time, an EKG technician at the VA.  ECF 33-4 (temporary detail letter).  Neal reported and testified that Lewis did not knock before entering.  ECF 33-3 at 6; ECF 33-12 at 6 (Tr. at 23).  In contrast, Poole reported to the VA police, and later testified, that Lewis knocked but entered the room without waiting for a response.  ECF 33-3 at 10; ECF 38-1 at 51 (Tr. at 12). Lewis has asserted that the door was partially open.  ECF 33-3 at 13.  After entering the room, Lewis pulled back the privacy curtain and began speaking with Poole concerning an unrelated patient issue.  ECF 33-12 at 51 (Tr. at 14).

Neal was upset about Lewis's entry, and believed that he was "hovering all over" her.  *Id.* at 5 (Tr. at 19).[5]  Neal said to Lewis: "Excuse me . . . don't you see that my titty's [sic] are all out and why are you in here."  ECF 33-3 at 6.  According to Neal, Lewis ignored her and continued to talk with Poole, before telling Neal that he thought she was a male, and did not know a female was in the room.  *Id.*; ECF 33-12 at 5 (Tr. at 19).  Neal asked if she looked like a man, to which Lewis responded that she did.  ECF 33-3 at 6; ECF 33-12 at 5 (Tr. at 19).  At this point, Poole looked "shocked" and asked Lewis to leave the room, which he did.  ECF 33-3 at 6.

In Lewis's statement to the VA police, he described the incident somewhat differently.  He asserted that after he heard Neal say "excuse me," he "immediately apologized."  *Id.* at 13.  When

---

[5] Neal also testified that Lewis had an erection, which touched her head.  ECF 33-12 at 6-7 (Tr. at 21-25). However, I previously dismissed any claim related to sexual assault.  *See* ECF 14 at 15-16.

Neal persisted, he apologized again and said that because it was dark and Neal's hair was short, he thought she was a man. *Id*. He then closed the curtain and left. *Id*.

For her part, Poole reported and then testified that Neal asked Lewis why he was in the room. Lewis apologized and said he did not realize Neal was a female, which resulted in some back-and-forth before Lewis left the room. *Id*. at 10; ECF 38-1 at 52 (Tr. at 14-17).

After Lewis left the room, Poole completed the medical procedure. ECF 38-1 at 52 (Tr. at 16-17). Neal was upset, and discussed the incident with Poole. ECF 33-12 at 7 (Tr. at 26-27); ECF 38-1 at 52-53 (Tr. at 17-18). At Neal's request, Poole reluctantly gave Neal the name of Lewis's supervisor, Dr. Shawn Robinson. ECF 33-12 at 7 (Tr. at 26-27); ECF 38-1 at 52 (Tr. at 17). He has been the "chief of the cardiology section" since 2011 or 2012. ECF 38-1 at 24 (Tr. at 7). Dr. Robinson testified that after this incident, he "had to call the patient [*i.e.*, Neal] . . . to apologize and explain." ECF 38-1 at 28-29 (Tr. at 25-26). Dr. Robinson also discussed the incident with Poole, and had the "impression" that Lewis's behavior "seemed somewhat intrusive." ECF 38-1 at 27-28 (Tr. at 21-23).

Neal immediately reported the incident to VA Patient Advocate Morris Ricks, who referred the matter to the VA police. ECF 33-3 at 1; ECF 33-12 at 7 (Tr. at 27-28). VA Detective Walter Jenkins was assigned to investigate the incident. ECF 33-3 at 3. He interviewed Neal, Poole, and Lewis and submitted a report that day. *Id*. at 1-4. Detective Jenkins also advised Lewis "not to have any type of contact with Neal." ECF 33-1 at 3.

Neal reported to the VA police that, according to Poole, Lewis engaged in this sort of behavior "all the time," and she thought Lewis had "adult ADHD." ECF 33-12 at 5 (Tr. at 20). However, Poole testified that she "never" said that Lewis had ADHD, nor that he "always" did

this. ECF 38-1 at 57 (Tr. at 35-36).  Rather, she claimed to have said that some doctors would enter the room without knocking.  *Id*.

On August 9, 2021, Lewis's supervisor, Dr. Robinson, temporarily reassigned Lewis to administrative duty pending the investigation.  ECF 33-4.  In his new assignment, Lewis was responsible, *inter alia*, for scheduling, consults, and recall reminders.  *Id*.

On August 10, 2017, Lewis called Neal on her telephone while she was at home.  ECF 33-3 at 8 (Neal's second witness statement), 17 (Lewis's second witness statement); ECF 33-12 at 8-10 (Tr. at 31-40).[6]  Lewis asserted that he obtained Neal's information, and called her as part of his normal scheduling duties, in order to schedule a "stress test" medical procedure.  ECF 33-3 at 17.  He said that he recognized Neal's name as the patient involved in the incident of August 7, 2017.  *Id*.  Even before Neal knew it was Lewis who was calling her, she found it "odd" to receive a phone call to schedule a stress test.  ECF 33-12 at 9 (Tr. at 35).  However, she later learned that a stress test "needed to be scheduled."  *Id*.[7]

Initially, Neal did not realize that she was speaking with Lewis.  ECF 13-3 at 8, 17; ECF 33-12 at 8 (Tr. at 31).  At some point in the call, Lewis asked Neal if she realized with whom she

---

[6] It is clear Neal was at home when she received the call. ECF 33-12 at 8 (Tr. at 31). The Opposition asserts Lewis called Neal's home telephone number, citing her deposition. ECF 38 at 5. Neal's interrogatory answers also specify her home telephone number. ECF 33-11 at 5. But, at her deposition, Neal was not explicit that Lewis called her home phone. She testified that the VA had both her home and cell phone numbers on file, and suggested that she had received at least some of the calls she asserted were from Lewis on her cell phone. ECF 33-12 at 14-15 (Tr. at 53-57).

[7] The Opposition asserts that Neal had already made a stress test appointment during her visit on August 7, 2017. ECF 38 at 5. At her deposition, Neal was asked: "And did you make a stress test appointment before you left the clinic on August 7 of 2017? I'm sure you had other things that were occupying you." ECF 33-12 at 9 (Tr. at 34). Neal answered, "Yes, ma'am." *Id*. However, it is unclear as to the portion of the question that Neal was answering. Regardless, she then testified explicitly that she later learned that she was, in fact, in need of a stress test when Lewis called. *Id*. (Tr. at 35).

was speaking.  ECF 13-3 at 8, 17; ECF 33-12 at 8 (Tr. at 31).  After Neal guessed that he was the Patient Advocate, Lewis said: "Nope.  I am the guy."  ECF 13-3 at 17; ECF 33-12 at 8 (Tr. at 31). Neal described the contact as "creepy and chilling."  ECF 33-12 at 10 (Tr. at 37).  In her report to the VA police, Neal stated that after Lewis identified himself, he apologized, and Neal informed him that she "accepted his apology but what he did was still invasion of [her] privacy."  ECF 13-3 at 8.  Lewis reported that he apologized and tried to explain himself, including as to why he thought Neal was a male, and that Neal accepted his apology.  *Id*. at 17.

At her deposition, Neal recalled that, after Lewis identified himself to her, she hung up in "disbelief" because she was so angry.  ECF 33-12 at 8 (Tr. at 32); *see id*. at 10 (Tr. at 38).  Lewis then called back right away, Neal answered, and Lewis began to apologize.  *Id*. at 8, 10 (Tr. at 32, 38).  Neal told him that she accepted the apology, but that his behavior was "not okay" and that he must have "mental issues."  *Id*. at 8 (Tr. at 32); *see id.* at 10 (Tr. at 38).

Initially, Neal testified that she told Lewis not to contact her again and hung up.  *Id*. at 8 (Tr. at 32).  Later, she indicated that she hung up without telling Lewis not to contact her again, he promptly called back a third time, and on that third call she told him not to contact her again.  *Id*. at 10 (Tr. at 38-40), 13 (Tr. at 51-52).  However, she also testified that she did not "recall exactly how many times" Lewis called her.  *Id*. at 10 (Tr. at 40).  In addition, she testified that it was possible that Lewis called her back because he did not realize she had hung up on him, and instead he thought the call had been inadvertently disconnected.  *Id*. at (Tr. at 39-40).

Neal stated that after this phone call, in which she told Lewis not to contact her again, Lewis called her "numerous times," but she never answered.  *Id*. at 8 (Tr. at 32); *see id*. at 11 (Tr. at 42).  Within about the first ten minutes of plaintiff's third call with Lewis on August 10, 2017, Neal received several phone calls from a phone number or numbers she did not recognize, which

she did not answer. *Id*. at 11 (Tr. at 41-43), 13 (Tr. at 51-54).[8]  Neal estimated that she received "more than likely less than ten" calls, but it is unclear from the deposition if she was referring to the number of calls during the initial ten-minute period, or to the number of calls generally after she spoke with Lewis. *Id*. at 11 (Tr. at 42-43).

After the ten-minute window on August 10, 2017, and continuing after August 10, 2017, Neal received telephone calls from a phone number or numbers that she did not recognize. *Id*. at 11-12 (Tr. at 43-46), 13 (Tr. at 51-52).  In general, Neal's testimony is imprecise on the number of calls she received, and over what period.  For example, she also testified at another point that she did not "recall" if Lewis called her after the third phone call. *Id*. at 11 (Tr. at 41).

In any event, Neal testified that after the initial ten-minute period, when the phone would ring, she would not "entertain" it. *Id*. at 11 (Tr. at 43).  If she received a call and did not recognize the phone number, she assumed that the call was from Lewis and she would not answer the call. *Id*. at 11-12 (Tr. at 44-46), 13 (Tr. at 51), 14 (Tr. at 53).  She assumed such calls were from Lewis because she "typically" did not have "random people" calling her, the numbers were not the 800 or 866 numbers she usually associated with spam calls, and the callers left no messages. *Id*. at 11-13 (Tr. at 44-45, 52-53).  She also attributed this belief to what she described as Lewis's "stalkerish" habit. *Id*. at 12 (Tr. at 45-46).

When Neal was asked when she had most recently received a call from Lewis, she simply responded that she assumed he called after August 10, 2017, but she "stopped entertaining answering the phone." *Id*. at 13 (Tr. at 51).  She also suggested that a call from a number she did not recognize, which she received roughly two weeks before the deposition on February 16, 2021,

---

[8] Neal testified that during this initial burst of calls and then after August 10, 2017, she was not "paying attention" to whether the phone numbers were the same. ECF 33-12 at 11 (Tr. at 43); *see id*. at 12 (Tr. at 46) (same).

was "[p]ossibly" from Lewis.  *Id*. at 14 (Tr. at 52-53).  Neal testified that she became "fearful for [her] life" and constantly afraid that Lewis would stalk her or visit her at her house.  *Id*. at 12-13 (Tr. at 48-51).

Neal reported her interaction of August 10, 2017, with Lewis to the VA police.  Notably, the witness statement only mentions one call.  ECF 33-3 at 8.

On August 18, 2017, Dr. Marc C. Hochberg, Chief of the Medical Care Clinical Center for the VA Maryland Health Care System, formally proposed to remove Lewis from employment with the VA.  ECF 33-5 ("2017 Letter").  The ground for the proposed removal was "Conduct Unbecoming a Federal Employee," based on the incidents of August 7, 2017, and August 10, 2017. *Id*. at 1.  The 2017 Letter described Lewis's conduct on August 7 as "serious," and his conduct on August 10 as "egregious."  *Id*.  The letter also cited past discipline against Lewis for similar issues, discussed *infra*.  *Id*.  Lewis was ultimately terminated as of September 8, 2017.  ECF 33-8 (Lewis's SF-50 form).[9]

It is undisputed that prior to August 2017, Lewis had been the subject of several other complaints and disciplinary measures relating to his conduct with female patients.  In January 2012, Dr. Robinson had signed a memo directing Lewis to have a female colleague perform EKGs for female patients, or else have a female chaperone present in the room.  ECF 33-6 ("2012 Memo").  The 2012 Memo also specified that Lewis was to follow EKG protocol "with respect to preserving patient modesty and minimizing contact with the breast tissue," and stated that "100% compliance . . . is imperative."  *Id*.  Although not mentioned in the 2012 Memo, Dr. Robinson

---

[9] Dr. Hochberg's letter described a process for a final decision by the "Director" as to Lewis's removal, as well as a right to reply and other procedural rights held by Lewis. ECF 33-5 at 2. However, the record does not contain any further documentation as to the process, aside from the SF-50 form reflecting final termination. *See* ECF 33-8.

testified that it was prompted by a report of "a female patient and inappropriate behavior."  ECF 38-1 at 25 (Tr. at 12-13).

Dr. Robinson testified that a second incident occurred "[s]omewhere around" 2016.  *Id.* at 25 (Tr. at 13), 26 (Tr. at 16).  According to Dr. Robinson, Lewis performed an EKG, accompanied by a female chaperone "who wasn't a clinician."  *Id.* at 25 (Tr. at 13).  The female chaperone "deemed the behavior [by Lewis] inappropriate or did not preserve [the patient's] modesty as much as she would have liked if it was her."  *Id.*  Dr. Robinson testified that there were "two such observations" relating to this incident.  *Id.*  Although Dr. Robinson had asked the female chaperone to "write up an incident report," no official report was prepared, because by then the patient in question could not be identified.  *Id.* at 25-26 (Tr. at 13-14).  Nevertheless, after this incident, Dr. Robinson instructed Lewis not to perform EKGs on women at all, and that if an EKG were needed and Lewis was the only person available, he should switch tasks with a female colleague.  *Id.* at 26 (Tr. at 14-15).  There was no "official statement" as to this change, but Robinson testified that it was confirmed via email to Lewis.  *Id.* (Tr. at 15-16).  However, the email is not included in the record.

A third incident occurred at some point after this new policy was put into place.  Dr. Robinson explained that "stress tests" are performed by nurse practitioners with the assistance of an EKG technician, such as Lewis, who places electrodes on the patient.  *Id.* (Tr. at 16-17).  In this incident, the nurse practitioner entered the exam room to find Lewis placing electrodes on the chest of a female patient.  *Id.* (Tr. at 17).  The nurse practitioner reported the occurrence, and an official "report of contact" was generated.  *Id.*  However, Dr. Robinson testified that this "one incident was not enough to remove [Lewis] from clinical duty."  *Id.*

10

In addition, the record contains a reprimand letter from Dr. Hochberg to Lewis dated February 3, 2016. ECF 33-7 ("2016 Letter"). The 2016 Letter informed Lewis that Dr. Hochberg had sustained a charge of "failure to follow instructions." *Id.* at 1. Moreover, the 2016 Letter specified that it would be placed in Lewis's Official Personnel Folder for three years and could be used to determine the appropriate penalty in the event of further infractions.

The 2017 Letter from Hochberg to Lewis mentions both the 2012 Memo and the 2016 Letter. ECF 33-5 at 1. Lewis's first witness statement asserts: "Since the time of my last complaint dating back to October 2015 in reference to a female patient, I have not encountered any problems." ECF 33-3 at 13. Detective Jenkins's report mentioned that during his investigation, Lewis "admitted" that "between the months of October and December 2015, he has had several complaints by female patients that he made them feel very uncomfortable during and after their procedures' [sic]. The patients stated that LEWIS would fail to cover or closed [sic] their robes. The patients stated that LEWIS would leave their breast[s] exposed. Because of these complaints, LEWIS was no longer allowed to perform any EKGS and Sonograms, etc. on female patients." *Id.* at 3-4.

### B. Damages

In Count 1 of her Complaint, Neal seeks economic damages "not to exceed" $5,000, and non-economic damages in the amount of $500,000 "for emotional distress and exacerbation of existing medical conditions." ECF 1, ¶ 49. Count 2 of the Complaint also seeks economic damages not to exceed $5,000, and $500,000 in non-economic damages. *Id.* ¶ 53.

Fed. R. Civ. P. 26(a)(1)(A)(iii) requires a party to provide, in an initial disclosure, "a computation of each category of damages claimed by the disclosing party," as well as to "make available for inspection and copying . . . the documents or other evidentiary material . . . on which

each computation is based, including materials bearing on the nature and extent of the injuries suffered." But, this is subject to any order by the Court. Fed. R. Civ. P. 26(a)(1)(A). And, the Scheduling Order in this case provided that "Fed. R. Civ. P. 26(a)(1) disclosures need not be made." ECF 18 at 2.

Nevertheless, Neal provided defendant with a document titled "Plaintiff's Tiffany Neal's 26(a)(1) Initial Disclosures." ECF 33-9 (Initial Disclosures). In this document, Neal included the following description of her damages, under "Relief Sought:" "Compensatory damages for pain and suffering in the amount of two million dollars ($2,000,000) and economic damages in the amount of $50,000." *Id*. at 4-5. In her initial disclosures, Neal also stated: "All financial records relating to Neal's economic losses as a result of Defendant's conduct are in the custody and control of Plaintiff Tiffany Neal." *Id*. at 3.

During discovery, the Government requested a variety of documents related to Neal's damages and injuries, and also asked Neal about her damages and injuries in its Interrogatories. *See* ECF 33-10 (Def.'s First Set of Requests for Production); ECF 33-11. Neal apparently provided some medical records to the Government in response to its request for production, although these are not included in the record. *See* ECF 38 at 17. But, as discussed, *infra*, the Government contends that Neal did not substantiate her financial claims. ECF 33-1 at 7.

Neal provided an expansive description of her asserted injuries. ECF 33-11 at 7-9; ECF 33-12 at 16 (Tr. at 62); *id.* at 18 (Tr. at 70-72). She asserts that many of her health conditions appeared for the first time, or substantially worsened, following the August 2017 incidents. ECF 33-11 at 4, 9; ECF 33-12 at 16-17 (Tr. at 63-65). In particular, Neal attributes the following conditions to Lewis's conduct:

- "[I]nconvenience, pain and suffering, anxiety and panic attacks, sleeplessness, emotional injuries, [and] psychological trauma." ECF 33-11 at 7; *see also id*. at 9.  At her deposition, she clarified that by "inconvenience," she meant the experience of having to complain to the VA and go through litigation.  ECF 33-12 at 16 (Tr. at 62);

- "[S]evere anxiety, paranoia, fearfulness, hopelessness ideations, emotional distress, depression/isolation from friends and family, [and] nightmares/flashbacks," as well as humiliation and embarrassment, and a constant fear that Lewis will stalk her, harass her, or visit her at her residence.  ECF 33-11 at 8; *see also id*. at 7-9.  For example, she had a "panic attack" and flashbacks at a subsequent medical appointment, when a male technician was responsible for administering an infusion.  *Id*. at 7.

- An "exacerbation" of Neal's Crohn's disease; according to Neal, prior to the incidents, her disease was effectively managed and was in remission, but the incidents have caused "severe chronic fatigue syndrome, and other medical conditions."  *Id*.

- "Serious gastrointestinal illness" due to the stress and trauma of the incidents.  *Id*. at 7.

- Worsening abdominal pain, which "weakens her every day."  *Id*. at 9.

- A miscarriage as a result of the stress and trauma of the incidents.  *Id*. at 7.

- "[D]ue to the constant anxiety," Neal's "body broke down," leading to "fibroids, a lump in her breast, neurological issues, short term memory,[10] internal ear pain and itching, tinnitus and ringing ears, discharge from her ears and general bodily illness."  *Id*. at 7-8; *see also id*. at 9.

---

[10] Presumably, this means short term memory loss.

13

- At her deposition, Neal also claimed that her "getting sicker" contributed to marital difficulties, and ultimately her divorce from her husband, because she was not able to perform what she described as her "wifely duties," such as caring for their children, cooking and cleaning, and sex. ECF 33-12 at 18 (Tr. at 70-72). She described her husband as her "only support system," asserting that her health issues contributed to her losing this support system. *Id.* (Tr. at 70).

Neal maintains that until "immediately after" the incidents, she had never suffered from fibroids, inflammation, chronic fatigue, a lump in her breast, a miscarriage, ear problems, or "psychological concerns," "among other ailments." ECF 33-11 at 9. Nor had she experienced panic attacks, sleeplessness, "emotional injuries," paranoia, hopelessness, or depression. ECF 33-12 at 16-17 (Tr. at 63-65). Moreover, except for marriage counseling, she had not seen a mental health professional prior to the incidents. *Id.* at 17 (Tr. at 65). However, she testified that even before the incidents in August 2017, she had anxiety related to "going to the doctor's appointments and the whole hospital thing." *Id.* at 16 (Tr. at 62-63). She also testified she had "PTSD" prior to the incidents, "for an old doctor and hospital anxiety." *Id.* at 17 (Tr. at 64).

As for her Crohn's disease, Neal testified that she was first diagnosed with the condition in 2008, and began taking medication for it at some point thereafter, but then went off the medication. *Id.* at 17 (Tr. at 65-66), 18 (Tr. at 68-69). Neal described her Crohn's disease as in "remission" for "a few months" before the August 2017 incidents, which she defined as experiencing some symptoms, but not "as intense," and not requiring hospitalization. *Id.* at 17 (Tr. at 65-68). According to Neal, after the incidents the stress "exacerbated" her condition. *Id.* at 18 (Tr. at 69-70).

14

In Neal's interrogatory responses, she asserted that her "medical service providers" found that "she suffered emotional damages and physical damages as a result" of the August 2017 incidents. ECF 33-11 at 4. At her deposition, she testified that the providers were "Ms. Wong," her "GI doctor," and "Ms. Clarissa," her "mental health therapist." ECF 33-12 at 16 (Tr. at 61). No additional information about these providers, or their conclusions, is contained in the record. Nor is there any other documentation or evidence in the record as to causation, aside from the temporal proximity, discussed above.

With respect to damages, Neal's responses to the Government's interrogatories (ECF 33-11) indicate that she increased her claim of economic damages from $50,000 to $150,000, and she again requested $2 million in non-economic damages. *Id.* at 8. But, the Government maintains that, despite its discovery requests, Neal "provided no proof or itemization of economic damages." ECF 33-1 at 7. Nor has she "produced a single page of records containing a dollar amount spent on medical care, despite admitting that the documents relating to her economic loss are in her custody and control." ECF 45 at 3.

Neal's answers to the Government's interrogatories indicate, without specificity, that Neal "incurred several out-of-pocket costs incidental to receiving medical treatment and prescription medications." ECF 33-11 at 10. During her deposition, Neal testified that because of her anxiety regarding her personal safety, she purchased "the most expensive phone" so she could tell who was calling her and "added some extra cameras" at her home. ECF 33-12 at 19 (Tr. at 73). She also testified that she had paid "partially out of pocket" for her therapy sessions. *Id.* (Tr. at 73-74). However, no specific amounts or documentation were provided as to these expenses.

Plaintiff received treatment for her medical conditions at the VA as well as at Johns Hopkins Hospital.  ECF 33-11 at 9.  But, plaintiff stated in discovery that her "medical treatment has been paid for by the U.S Department of Veterans Affairs."  *Id.* at 10.

Beyond the assertions and information recounted earlier, no additional information, documentation, or computation as to Neal's injuries and damages is included in the record. Notably, plaintiff has not designated any experts or offered any expert testimony or material as to causation or any other issue.  *Id.*

Additional facts are included, *infra*.

## II.    Legal Standards

### A.  Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Market Development Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law.").  The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on the issue at trial, she must support her factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations ..., admissions, interrogatory answers, or other materials...."  But, where the nonmovant bears the burden of proof at trial, the moving party may show that it is entitled to summary judgment by citing to evidence in the record.  And, "the burden on the moving party may [also] be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

    "Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact."  *Brother Convenience Store, Inc. v. U.S. Dep't of Agriculture*, GLR-20-1346, 2021 WL 3911594, at *8 (D. Md. Sept. 1, 2021) (citing *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586-87).  Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24.  As indicated, the court must view all of the facts, including any reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

    The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion

for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.; *see Sharif v. United Airlines, Inc*., 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Wilson v. Prince George's Cty., Maryland*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Where there is conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black &*

*Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).

Of relevance here, Rule 56 permits a litigant to move for partial summary judgment, and for the Court to resolve certain issues at summary judgment, rather than the entire case. *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought."); *see also, e.g.*, *Nguti v. Safeco Ins. Co.*, PX-15-742, 2017 WL 2778821, at *2 (D. Md. June 27, 2017) ("A motion for partial summary judgment is recognized as a useful pretrial tool; the Advisory Committee Notes to the 1946 amendment to Rule 56 state: 'The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case. This adjudication . . . serves the purpose of speeding up litigation by' narrowing the issues for trial to those over which there is a genuine dispute of material fact."); *Rotorex Co., Inc. v. Kingsbury Corp.*, 42 F. Supp. 2d 563, 571 (D. Md. 1999) ("[N]umerous courts have entertained and decided motions for partial summary judgment addressing particular issues.").

## B.  The FTCA and Choice of Law

As noted, both of Neal's claims, as to professional negligence and intrusion upon seclusion, are brought against the United States pursuant to the FTCA. *See* ECF 1 at 1. "Absent a statutory waiver, sovereign immunity shields the United States from a civil tort suit." *Kerns v. United States*, 585 F.3d 187, 193-94 (4th Cir. 2009) (citing *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). But, to the extent that the United States has expressly waived sovereign immunity, a plaintiff may recover against the United States. *See*, *e.g.*, *Welch v. United States*, 409 F.3d 646, 650 (4th Cir. 2005) (citation omitted); *see also Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95 (1990)

(holding that a waiver of sovereign immunity "cannot be implied but must be unequivocally expressed") (citation and internal quotation marks omitted).

Under the FTCA, Congress has waived the sovereign immunity of the United States, exposing it to tort liability for claims "for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment," so long as certain conditions are satisfied. 28 U.S.C. § 1346(b)(1); *see Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 217-18 (2008). But, "'the FTCA is strictly construed, and all ambiguities are resolved in favor of the United States.'" *Lins*, 847 Fed. App'x at 162 (quoting *Williams v. United States*, 50 F.3d 299, 305 (4th Cir. 1995)). Moreover, the United States may be liable under the FTCA only to the extent that a "private person[]" would be liable to the claimant in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1), and only "in the same manner and to the same extent as a private individual under like circumstances." *Id.* § 2674. Thus, "the substantive law of each state establishes the cause of action." *Anderson v. United States*, 669 F.3d 161, 164 (4th Cir. 2012).

And, the United States is not liable for *all* torts committed by federal employees. Section 1346(b) of Title 28 "grants the federal district courts jurisdiction over a certain category of claims for which the United States has waived its sovereign immunity." *F.D.I.C. v. Meyer*, 510 U.S. 471, 477 (1994). For a claim to fall within that "certain category," it must be:

> "[1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

*Id.* (quoting 28 U.S.C. § 1346(b)(1)) (alterations in original).

Notably, Congress has not waived sovereign immunity for any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."   28 U.S.C. § 2680(a).   This prevents "judicial second-guessing" of administrative and legislative decisions grounded in policy.   *United States v. Gaubert*, 499 U.S. 315, 323 (1991).   Accordingly, the discretionary function exception "protects only governmental actions and decisions based on considerations of public policy."   *Berkovitz v. United States*, 486 U.S. 531, 537 (1988); *see also Lins*, 847 Fed. App'x at 163; *Suter v. United States*, 441 F.3d 306, 311 (4th Cir. 2006).

In *Lins*, the Fourth Circuit recently explained the application of the discretionary function exception.   It said, 847 Fed. App'x at 163 (cleaned up):

> In determining whether the discretionary function exception bars a claim, a court should consider whether a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. Thus, the first consideration in deciding whether or not the discretionary function exception applies is to determine whether the action at issue involves an element of choice or judgment. If it does, the court should consider whether that judgment is of the kind that the discretionary function exception was designed to shield. This inquiry focuses not on the agent's subjective intent in exercising the discretion but on the nature of the actions taken and on whether they are susceptible to policy analysis.

If a "a statute, regulation, or policy prescribes a specific course of action," then there is no judgment or choice.   *Rich v. United States*, 811 F.3d 140, 144 (4th Cir. 2015) (citation omitted).   In that circumstance, the discretionary function exception does not apply.   *Id.*

Because these elements are prerequisites for consideration under the FTCA, each one of them must be considered jurisdictional.   *See Kerns*, 585 F.3d at 194 (stating that "if [the federal employee] was acting outside the scope of her employment with the Government, the district court lacks jurisdiction").   Similarly, the exceptions to the Government's waiver of sovereign immunity,

enumerated in 28 U.S.C. § 2680, are also jurisdictional. *Welch*, 409 F.3d at 651. And, the plaintiff has the burden of establishing that an "unequivocal waiver of sovereign immunity exists and that none of the [FTCA's] waiver exceptions apply to his particular claim." *Welch*, 409 F.3d at 651.

At the motion to dismiss stage, I addressed the Government's argument that the waiver of sovereign immunity contained in the FTCA did not apply to Neal's suit. ECF 14 at 12-23. On that basis, I dismissed Neal's claims for sexual assault and for negligent hiring, training, and supervision, but permitted the remainder of her claims to go forward. *Id.* But, as discussed in more detail *infra*, *Lins* made clear that my decision with respect to Neal's negligent supervision claim was in error.

State law, not federal law, serves as the source of substantive liability. *See United States v. St. Louis Univ.*, 336 F.3d 294, 300 (4th Cir. 2003) (citation omitted). Notably, "[t]he Supreme Court has concluded that the 'law of the place' refers to the 'whole law,' including choice-of-law principles of the state where the negligent act or omission occurred." *Id.* (citing *Richards v. United States*, 369 U.S. 1, 11 (1962)).

As the parties recognize, Maryland follows the rule of *lex loci delicti* for tort actions. This means that the court must apply the substantive law of the state where the wrong occurred. *Proctor v. Washington Metropolitan Area Transit Authority*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 620, 925 A.2d 636, 648-49 (2007). Because the conduct of Lewis took place entirely in Maryland, I shall apply Maryland law.

### III.   Summary Judgment Discussion

The Government asserts three grounds for summary judgment, either in whole or in part. It argues that expert evidence is required to establish causation between Lewis's behavior and plaintiff's injuries, and that because plaintiff has provided no such evidence, the Government is

entitled to summary judgment.  ECF 33-1 at 9-11.  Further, it contends that because plaintiff has failed to itemize, calculate, or otherwise substantiate her claim for damages, the Government is entitled to summary judgment, at least as to economic damages.  *Id*. at 7-8.  Finally, it asserts that the Government is entitled to summary judgment as to plaintiff's claim for intrusion upon seclusion, to the extent the claim is premised on Lewis's phone calls.  *Id*. at 11-15.

The Court addresses each of these arguments in turn, mindful of the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'"  *Bouchat*, 346 F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

### A.  Causation and Expert Testimony

The Government argues that, given the magnitude of Neal's asserted damages and the multitude of medical injuries she claims as a consequence of the August 2017 incidents, she is required to offer expert testimony to establish proximate causation.  ECF 33-1 at 9-11.  In its view, this "[f]ailure to prove causation is fatal to Plaintiff's professional negligence claims and precludes her from presenting damages testimony on her intrusion upon seclusion claims."  *Id*. at 11.  In response, Neal argues that the record contains adequate evidence to support a finding by a factfinder as to causation.  ECF 38 at 15-19.  In the alternative, plaintiff contends that she should be permitted to designate an expert on this issue for trial, rather than face summary judgment.  *Id*. at 19.  In other words, Neal wants a "do-over."

### 1.

Although the substantive law of Maryland governs plaintiff's claims, the federal rules of procedure apply to determine "whether there is sufficient evidence to create a jury issue of those essential substantive elements of the action, as defined by state law[.]"  *Fitzgerald v. Manning*,

679 F.2d 341, 346 (4th Cir. 1982); *accord Jordan v. Iverson Mall Ltd. P'ship*, GJH-14-37, 2018 WL 2391999, at *5 (D. Md. May 25, 2018); *Osunde v. Lewis*, 218 F.R.D. 250, 260 (D. Md. 2012); *Young v. United States*, 667 F. Supp. 2d 554, 561 (D. Md. 2009). The Fourth Circuit has said: "In a long line of decisions in this circuit, we have emphasized that proof of causation must be such as to suggest 'probability' rather than mere 'possibility,' precisely to guard against raw speculation by the fact-finder. Where . . . resolution of the causation issue is dependent upon expert opinion testimony, it must meet that standard." *Sakaria v. Trans World Airlines*, 8 F.3d 164, 172-73 (4th Cir. 1993) (internal citations omitted).

In Maryland, "to assert a claim in negligence, the plaintiff must prove: '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.'" *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 212-13, 60 A.3d 1, 10 (2013) (quoting *Lloyd v. Gen'l Motors Corp.*, 397 Md. 108, 131-32, 916 A.2d 257, 270-71 (2007) ) (emphasis omitted); *see Schultz v. Bank of Am., N.A.*, 413 Md. 15, 27, 990 A.2d 1078, 1086 (2010) ("In a negligence case, there are four elements that the plaintiff must prove to prevail: 'a duty owed to him [or her] (or to a class of which he [or she] is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages.'") (quoting *Jacques v. First Nat. Bank of Maryland*, 307 Md. 527, 531, 515 A.2d 756, 758 (1986)) (alterations in *Schultz*).

Count I of Neal's Complaint is for "professional negligence," and asserts various examples of negligence. ECF 1, ¶¶ 30-49. "The elements required to establish a cause of action for professional negligence are equivalent to the elements required in a standard negligence action; the professional, however, is held to the standard of care that prevails in his or her profession."

*Balfour Beatty Infra., Inc. v. Rummel Klepper & Kahl, LLP*, 226 Md. App. 420, 438, 130 A.3d 1024, 1035 (2016).

"It is a basic principle that '[n]egligence is not actionable unless it is a proximate cause of the harm alleged.'" *Pittway Corp. v. Collins*, 409 Md. 218, 243, 973 A.2d 771, 786 (2009) (quoting *Stone v. Chicago Title Ins*., 330 Md. 329, 337, 624 A.2d 496, 500 (1993)) (alteration in *Pittway*). A determination as to proximate cause involves not only a determination of cause-in-fact, but also a judgment as to whether an individual should "be held legally responsible for the consequences of an act or omission." *Peterson v. Underwood*, 258 Md. 9, 16, 264 A.2d 851, 855 (1970). "This determination is subject to considerations of fairness or social policy as well as mere causation." *Id*.

Thus, in Maryland, "[t]o be a proximate cause for an injury, 'the negligence must be 1) a cause in fact, and 2) a legally cognizable cause.'" *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 429, 56 A.3d 170, 195 (2012) (quotations and citation omitted); *see Pittway Corp*., 409 Md. at 243, 973 A.2d at 786 (quoting *Hartford Ins. Co. v. Manor Inn*, 355 Md. 135, 156-57, 642 A.2d 219, 230 (1994)). "The first step in the analysis . . . is an examination of causation-in-fact to determine who or what caused an action. The second step is a legal analysis to determine who should pay for the harmful consequences of such an action." *Pittway Corp*., 409 Md. at 244, 973 A.2d at 786.

Maryland courts treat the first step as a "threshold inquiry of 'whether [the] defendant's conduct actually produced an injury.'" *Id*. (quoting *Peterson*, 258 Md. at 16-17, 264 A.2d at 855). When only the defendant's negligent act is at issue, causation-in-fact is satisfied if the "the injury would not have occurred absent or 'but for' the defendant's negligent act." *Pittway Corp*., 409 Md. at 244, 973 A.2d at 786-87. When an injury is the result of two or more independent negligent

acts, causation-in-fact is satisfied if it is 'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Id*. at 244, 973 A.2d at 787.

The second step, "whether the defendant's actions constitute a legally cognizable cause of the complainant's injuries," is a test of foreseeability. *Id*. at 245-46, 973 A.2d at 787-88. A court must "consider whether the actual legal harm to a litigant falls within a general field of danger that the actor should have anticipated or expected." *Id*. at 245, 973 A.2d at 787 (citing *Stone*, 330 Md. at 337, 624 A.2d at 500). If the harm was a foreseeable result of the defendant's negligent conduct, then the requirement for legal causation is generally met. *See Pittway Corp*., 409 Md. at 246, 973 A.2d at 788. However, a court may limit liability where the injury is remote from the negligent conduct and the harm is out of proportion to the defendant's culpability. *See id*. at 246-47, 973 A.2d at 788.

## 2.

In many contexts, including those in which the injuries asserted are medical in nature, expert opinion is critical to establish causation. Indeed, in some circumstances the failure of a plaintiff to offer adequate expert opinion can result in summary judgment for the defendant. *See, e.g.*, *Aventis Pasteur, Inc. v. Skevofilax*, 396 Md. 405, 443, 914 A.2d 113, 135-36 (2007) ("Despite three amended scheduling orders, and approximately 11 months allotted to conduct discovery, Respondents failed to produce an expert who could testify to specific causation within a reasonable degree of scientific certainty. Without such an expert, Respondents' claims must fail as a matter of law."). This, the Government asserts, is this case here.

Determining whether the particular injury asserted requires expert testimony to establish causation is often a difficult and fact-sensitive undertaking. A canonical case in Maryland on this issue is *Wilhelm v. State Traffic Safety Commission*, 230 Md. 91, 185 A.2d 715 (1962). There, the

Maryland Court of Appeals recognized: "There are, unquestionably, many occasions where the causal connection between a defendant's negligence and a disability claimed by a plaintiff does not need to be established by expert testimony." *Id.* at 99, 185 A.2d at 719.  But, "where the cause of an injry [sic] claimed to have resulted from a negligent act is a complicated medical question involving fact finding which properly falls within the province of medical experts . . . proof of the cause must be made by such witnesses." *Id.* at 100, 185 A.2d at 719.

The court explained: "[A] question involving the causes of emotional disturbances in a person sufficient to evoke, subconsciously, grossly exaggerated symptoms is an intricate and complex one, peculiarly appropriate for science to answer. To allow a jury of laymen, unskilled in medical science, to attempt to answer such a question would permit the rankest kind of guesswork, speculation and conjecture." *Id*. at 101, 185 A.2d at 719.  Applying this principle, the court concluded that the trial judge was correct to instruct the jury that there was no legally sufficient evidence to show that the car crash in which plaintiff had been involved resulted in various alleged emotional disturbances, "psychiatric involvement, psychosomatic factors, or mental state." *Id*. at 97-98, 185 A.2d at 717-18.  The court also upheld a similar instruction as to abdominal and back pain that the plaintiff had associated with her menstrual periods, remarking that the question "was a complicated one, presenting an involved and intricate medical inquiry, the solution of which was singularly suitable for determination by medical science." *Id*.  However, the court held that the trial judge should have permitted the jury to consider the question of a causal connection between the crash and a loss of pigmentation in the plaintiff's skin within a few weeks of the crash, concluding that "common experience, knowledge and observation of laymen, we think, would permit a rational inference" as to causation.  *Id*. at 103-05, 185 A.2d at 721-22.

Subsequent decisions applying the principles of *Wilhelm* in various contexts are legion. *See, e.g.*, *Galloway v. Horne Concrete Const.*, 524 Fed. App'x 865, 870-72 (4th Cir. 2012) (no expert needed for back injuries that developed immediately after a significant tractor-trailer crash); *Mijares v. Walmart, Inc.*, PWG-19-1804, 2020 WL 5369183, at *3-5 (D. Md. Sept. 8, 2020) (expert needed to link light injuries at a Walmart to Bell's Palsy, a frozen shoulder, and other issues); *Osunde*, 281 F.R.D at 261-64 (expert needed to link premature birth after a car crash involving the mother to child's death four months later); *Skevofilax*, 396 Md. at 440-43, 914 A.2d at 134-36 (expert needed to link vaccines to autism); *Vance v. Vance*, 286 Md. 490, 502-04, 408 A.2d 728, 734 (1979) (no expert needed to link wife learning of husband's bigamy to mental distress and depression); *Tully v. Dasher*, 250 Md. 424, 436-37, 244 A.2d 207, 214-15 (1968) (no expert needed for nervousness, headaches, and upset stomach that developed immediately after arrest for allegedly disorderly house party); *Johnson v. Zerivitz*, 234 Md. 113, 115-18, 198 A.2d 254, 255-57 (1964) (expert needed to link vehicle accident to emotional disturbances, and to leg injury two years later); *Craig v. Chenoweth*, 232 Md. 397, 399-402, 194 A.2d 78, 79-80 (1963) (expert needed to link vehicle accident to partial paralysis of hand six weeks later); *Greater Metro. Orthopaedics, P.A. v. Ward*, 147 Md. App. 686, 691-95, 810 A.2d 534, 537-39 (2002) (expert needed to link stroke to various permanent injuries); *Desua v. Yokim*, 137 Md. App. 138, 145-49 768 A.2d 56, 59-62 (2001) (expert needed to link vehicle accident with soft-tissue neck injury); *Hunt v. Mercy Med. Ctr.*, 121 Md. App. 516, 538-43, 710 A.2d 362, 373-75 (1998) (no expert needed to link cancer misdiagnosis to emotional distress); *S.B. Thomas, Inc. v. Thompson*, 114 Md. App. 357, 371-86, 689 A.2d 1301, 1308-15 (1997) (expert needed to link back injury with herniated disc eight months later); *Strong v. Prince George's Cty.*, 77 Md. App. 177, 183-84, 549 A.2d 1142, 1145 (1988) (expert needed to link car crash with onset of pancreatitis several months

later); *Schweitzer v. Sowell*, 19 Md. App. 537, 543-44, 313 A.2d 97, 101-02 (1974) (no expert needed to link vehicle accident and buckling of knee 14 months later); *Kraft v. Freedman*, 15 Md. App. 187, 193-94, 289 A.2d 614, 618 (1972) (expert needed to link car crash with recurrence of preexisting ileitis, an inflammation of the small intestine).

In *S.B. Thomas*, 114 Md. App. at 376, 689 A.2d at 1310, the Maryland Court of Special Appeals extensively surveyed the law on this issue, and commented: "It is impossible to frame any neat verbal formula that will prove readily dispositive of future cases." Nevertheless, the court ventured to enumerate the circumstances in which a causal relationship may sometimes be shown, even without expert testimony, *id*. at 382, 689 A.2d at 1313:

> 1) a very close temporal relationship between the initial injury and the onset of the trauma; 2) the manifestation of the trauma in precisely the same part of the body that received the impact of the initial injury; 3) as in *Schweitzer v. Showell* [19 Md. App. 537, 543-44, 313 A.2d 97, 101 (1974)], some medical testimony, albeit falling short of a certain diagnosis; and 4) an obvious cause-and-effect relationship that is within the common knowledge of laymen.

"Conversely," the court said, *id*., "the causal relationship will almost always be deemed a complicated medical question and expert medical testimony will almost always be required when one or more of the following circumstances is present:"

> 1) some significant passage of time between the initial injury and the onset of the trauma; 2) the impact of the initial injury on one part of the body and the manifestation of the trauma in some remote part; 3) the absence of any medical testimony; and 4) a more arcane cause-and-effect relationship that is not part of common lay experience (the ileitis, the pancreatitis, etc.).

In *Galloway*, 524 Fed. App'x at 871, the Fourth Circuit also summarized the circumstances in which expert testimony is not required under *Wilhelm*:

> (1) if "a disability develops coincidentally with," or within a "reasonable time after," the subject act; or (2) if the proof of causation is "clearly apparent" from the nature and circumstances of the injury; or (3) if "the cause of the injury relates to matters of common experience, knowledge, or observation of laymen."

(Quoting *Wilhelm*, 230 Md. at 99, 185 A.2d at 719).

In *Hunt*, 121 Md. App. at 542, 710 A.2d at 375, the Maryland Court of Special Appeals discussed *Wilhelm*, *Vance* and other cases in regard to proof of causation as to emotional injuries. It said, *id.*:

> [W]hile there may yet lurk some alleged manifestations of emotional injury that are themselves so medically complicated that expert testimony will almost always be required in order to show causation (such as an unconscious tendency to exaggerate physical injuries), other manifestations will tend to be resolved on a case-by-case basis. If the malady is common, if it tends to arise from emotional distress, and if it arises contemporaneously with the emotional distress, then it is highly probable that no complicated medical question is present. A jury is then capable of determining whether causation is established or not. On the other hand, if the malady is unusual, if it is not easily foreseeable as a result of emotional distress, or if it does not arise contemporaneously with the onset of the emotional distress, then the issue is far more probable to present a complicated medical question requiring the assistance of expert testimony. Furthermore, an otherwise simple issue of causation may become a complicated medical matter if under the facts of the case there is a possibility that the symptoms predated the emotional shock or arose from an independent source.

*See also Exxon Mobil Corp. v. Albright*, 433 Md. 303, 367, 71 A.3d 30, 69 (2013) ("As we noted in *Vance*, claims for emotional distress need not be supported necessarily by expert medical testimony to establish injury and causation where 'the causal connection is clearly apparent from the illness itself and the circumstances surrounding it, or where the cause of the injury relates to matters of common experience, knowledge, or observation of laymen.'" (quoting *Vance*, 286 Md. at 502-03, 408 A.2d at 734-35).

Also relevant here is the conclusion by the Maryland Court of Special Appeals in *Desua*, 137 Md. App. at 148, 768 A.2d at 61, to the effect that a "disparity between the damage to appellant's vehicle and the amount of her personal injury claim" increases the necessity of an expert to establish causation. In that case, the court contrasted with skepticism plaintiff's

description of an accident as "relatively simple," and "without huge expenses," with her demand for $150,000 in compensatory damages. *Id*.

In this case, Neal claims that a medical technician saw her in a state of partial undress. And, according to Neal, he subsequently contacted her by phone on several occasions. For this, she seeks $150,000 in economic damages, for which virtually no itemized justification or computation has been provided. And, she seeks a significantly larger award of $2 million in non-economic damages. ECF 33-11 at 8. Moreover, she attributes to the incidents a host of medical and personal issues that, on their face, would seem to be wholly out of proportion to the incidents or unrelated to them, without any expert testimony that links the conditions to the occurrence.

### 3.

Applying the principles outlined above, expert testimony is plainly required to establish causation for a number of Neal's asserted injuries. This is true for the exacerbation of Neal's Crohn's disease; the effects of this exacerbation, including severe chronic fatigue syndrome and fibroids; gastrointestinal illness; worsening abdominal pain; a miscarriage; the lump in Neal's breast; neurological issues; short term memory issues; the ear issues, including internal ear pain, itching, tinnitus, ringing ears, and discharge; and general bodily illness. *See* ECF 33-11 at 7-9.

The alleged connection between the events of August 2017—the incident at the VA on August 7, followed by Lewis's telephone calls to Neal—and the medical conditions that plaintiff attributes to them, is well beyond any "obvious cause-and-effect relationship that is within the common knowledge of laymen." *S.B. Thomas*, 114 Md. App. at 382, 689 A.2d at 1313. To the contrary, the question of any connection between the August 2017 incidents and medical conditions such as Crohn's disease, fibroids, gastrointestinal illness, a breast lump, ear injuries, and a miscarriage, is "a complicated one, presenting an involved and intricate medical inquiry, the

solution of which [is] singularly suitable for determination by medical science." *Wilhelm*, 230 Md. at 101, 185 A.2d at 719.  Any cause-and-effect relationship between the August 2017 incidents and these conditions is not within the knowledge of lay persons.  And, insofar as these physical injuries are claimed to be the result of Neal's stress, anxiety, and emotional trauma, the causal connection between her emotional injuries and these asserted physical manifestations similarly presents "a complicated medical question requiring the assistance of expert testimony." *Hunt*, 121 Md. App. at 542, 710 A.2d at 375.[11]

A number of cases cited previously feature comparable circumstances in which courts required expert testimony to show a causal connection between the underlying incident and the asserted condition.  For example, in *Strong,* 77 Md. App. at 183-84, 549 A.2d at 1145, the Maryland Court of Special Appeals determined that an expert was required to link a motor vehicle crash to the emergence of pancreatitis, for which the court noted that there are multiple possible causes.  Similarly, in *Kraft*, 15 Md. App. at 193-94, 289 A.2d at 618, the Maryland appellate court concluded that an expert was required to link a rear-end collision to a recurrence of ileitis, an inflammation of the small intestine.  *See also, e.g.*, *Craig*, 232 Md. at 399-402, 194 A.2d at 79-80 (expert required to link vehicle accident to partial paralysis of plaintiff's left forefinger and thumb six weeks later); *Wilhelm*, 230 Md. at 101, 185 A.2d at 719 (expert required to link car crash to abdominal and back pain associated with plaintiff's menstrual periods).

Neal's vague assertion that many of these symptoms did not appear until "immediately after" the August 2017 incidents (ECF 33-11 at 9) is not sufficient to overcome the need for expert testimony as to causation in this context, given the complicated nature of the medical conditions

---

[11]  Even assuming, *arguendo*, a causal relationship, it is difficult to conclude that events such as a miscarriage were foreseeable.

at issue and their potential causes.  This is particularly true considering that plaintiff has introduced virtually no medical information or records as to her conditions, save a similarly vague assertion at Neal's deposition that two medical service providers, a "Ms. Wong" and a "Ms. Clarrisa," had told plaintiff that "she suffered emotional damages and physical damages as a result" of the incidents.  ECF 33-12 at 16 (Tr. at 61).  And, although Neal's Crohn's disease may have worsened after August 2017, Neal testified that up until a "few months" before then, her symptoms were still quite serious, even requiring hospitalization at times.  *Id.* at 17 (Tr. at 65-68).  This creates additional difficulties as to causation.  The expansive nature of Neal's injuries and her damages claim, in comparison to this minimal record, is also a factor that weighs in favor of requiring expert testimony as to causation.  *See Desua*, 137 Md. App. at 148, 768 A.2d at 61 (significant disparity between damages to vehicle and claimed compensatory damages increased need for an expert as to causation).

In her Opposition, Neal argues: "Defendant does not produce any expert to support any proposition that Neal's injuries could not have arose from Grant Lewis' wrongful conduct because Defendant reviewed the substantial voluminous medical records of Neal demonstrating that after August 7, 2017, her medical condition became worse."  ECF 38 at 17.[12]  But, this misapprehends the allocation of burdens between plaintiff and defendant.  As the plaintiff, it is Neal who must prove at trial each element of her claim, including causation.  *See, e.g.*, *Schultz*, 413 Md. at 27, 990 A.2d at 1086.  But, as the nonmovant here, with the burden of proof at trial, the movant may show that it is entitled to summary judgment by citing to evidence in the record, or by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case."

---

[12] None of these "substantial voluminous medical records" were submitted to the Court.

*Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).  At that point, Neal must generate a genuine dispute of material fact to survive the summary judgment motion.

In short, plaintiff claims causation as to multiple physical conditions: Crohn's disease and its effects; chronic fatigue syndrome; fibroids; gastrointestinal illness; abdominal pain; a miscarriage; the breast lump; neurological issues; short term memory issues; ear issues; and general bodily illness.  As the Maryland Court of Appeals recognized in *Vance*, 286 Md. at 502, 408 A.2d at 734, "a medical witness is ordinarily the only witness qualified to diagnose a physical ailment."  Moreover, to allow the case to go to trial on this record, without any expert testimony as to causation, "would permit the rankest kind of guesswork, speculation and conjecture." *Wilhelm*, 230 Md. at 101, 185 A.2d at 719.

For certain other conditions asserted by Neal, however, the need for an expert as to causation is a closer question.  Neal asserts, *inter alia*, that she experienced "anxiety and panic attacks, sleeplessness, emotional injuries, [and] psychological trauma" as a result of the August 2017 incidents.  ECF 33-11 at 7; *see also id*. at 9.  The anxiety and emotional trauma  included "severe anxiety, paranoia, fearfulness, hopelessness ideations, emotional distress, depression/isolation from friends and family, [and] nightmares/flashbacks," as well as humiliation and embarrassment, and a constant fear that Lewis will stalk Neal, harass her, or visit her at her residence.  *Id*. at 8; *see also id*. at 7-9.

The Motion does not advance any argument based on the "physical injury rule."  In Maryland, under this rule, "a right to recovery exists for emotional distress 'if it results in physical injury.'"  *Wheeling v. Selene Finance LP*, 473 Md. 356, 393, 250 A.3d 197, 219 (2021) (quoting *Vance*, 286 Md. at 494, 408 A.2d at 730).  "In *Vance* . . . for purposes of applying the 'modern rule,' the term 'physical' was not used in its ordinary dictionary sense, but instead 'is used to

represent that the injury for which recovery is sought is capable of objective determination.'"

*Hoffman v. Stamper*, 385 Md. 1, 34, 867 A.2d 276, 296 (2005) (quoting *Vance*, 286 Md. at 500,

408 A.2d at 732). The Court in *Hoffman* explained: "In that regard, we observed that it had been

held to include such things as depression, inability to work or perform routine household chores,

loss of appetite, insomnia, nightmares, loss of weight, extreme nervousness and irritability,

withdrawal from socialization, fainting, chest pains, headaches, and upset stomachs." *Hoffman*,

385 Md. at 34-35, 867 A.2d at 296.

The relevant cases in Maryland pertaining to claims of emotional injury seem to include

*Vance*, *Tully*, and *Hunt*, which are not cited in the briefing.

In *Vance*, 286 Md. 490, 408 A.2d 728, the plaintiff learned in the course of child support

and alimony proceedings that her husband had actually still been married to another woman at the

time he purportedly married the plaintiff.  *Id*. at 492, 408 A.2d at 729.  She sued, seeking

compensatory damages for emotional distress as a consequence of her husband's alleged negligent

misrepresentation.  *Id*. at 492-93, 408 A.2d at 729.  Lay witnesses testified that following the

revelation, the plaintiff was in a state of "emotional collapse," including depression,

embarrassment, symptoms of an ulcer, a changed appearance, and more.  *Id*. at 493-94, 408 A.2d

at 730.  But, no expert witness testified as to causation.

In regard to mental distress, the *Vance* Court observed that there is sometimes "heavy

reliance on the role of medical testimony to provide juries with an intelligent basis for evaluating

such claims." *Id*. at 502, 408 A.2d at 734.  But, the court ruled that "although use of expert medical

testimony may be advisable in light of cases in which plaintiffs alleging mental distress have

successfully established their claims . . . such testimony was not necessary in this case to recover

for mental distress." *Id*. at 502-03, 408 A.2d at 735.  This was because the plaintiff's "injury

related to matters of common experience and knowledge of lay persons." *Id.* at 503-04, 408 A.2d at 735. More recently, the Maryland Court of Appeals said: "In *Vance* . . . we determined that expert testimony was not necessary because the plaintiff's discovery of the true status of her 'marriage' and its attendant emotional toll is a matter within the common understanding of a layperson." *Exxon Mobil Corp.*, 433 Md. at 367, 71 A.3d at 70.

In *Tully*, 250 Md. 424, 244 A.2d 707, the plaintiffs sued their apartment building manager for malicious prosecution, after the manager swore out warrants charging the plaintiffs with disorderly conduct regarding a birthday party. 250 Md. at 426-30, 244 A.2d at 209-11. The Maryland Court of Appeals concluded that expert testimony was not required to prove causation between these events and the plaintiffs' claimed injuries of "nervousness, headaches [sic] and an upset stomach." *Id*. at 436-37, 244 A.2d at 214-15.

And in *Hunt*, 121 Md. App. 516, 710 A.2d 362, the plaintiff brought a medical malpractice action after he was misdiagnosed with prostate cancer and subjected to radiation therapy for three weeks before the mistake was discovered. *Id*. at 521-22, 710 A.2d at 365. The plaintiff claimed mood change, constipation, sleeplessness, and fatigue as a result of the shock and emotional distress of learning he had cancer, even before any effects from the radiation. *Id*. at 542-43, 710 A.2d at 375. The Maryland Court of Special Appeals determined that no expert was required as to causation, because these conditions were "entirely foreseeable results" of the misdiagnosis, and well within the competency of a reasonable juror. *Id.*

The Government relies heavily on the conclusion in *Wilhelm*, 230 Md. at 101, 185 A.2d at 719, that expert testimony is required for "the causes of emotional disturbances in a person sufficient to evoke, subconsciously, grossly exaggerated symptoms." But, the comparison is not quite apposite. This passage in *Wilhelm* concerned a situation in which the plaintiff, for

psychosomatic reasons, unconsciously exaggerated the physical injuries she had sustained from a car crash. *See id*. at 98, 185 A.2d at 718. The Maryland Court of Appeals held that expert testimony was required regarding the causes of such emotional disturbances. But, the psychological symptoms claimed by Neal here are more straightforward in their nature and in their connection to the August 2017 incidents.

The cases discussed above support the view that expert testimony is not necessarily required to establish causation as to the kind of psychological injuries that plaintiff claims to have suffered as a result of the incidents in August 2017. Viewed in the light most favorable to plaintiff, the evidence reflects that Neal was traumatized because Lewis barged into the exam room while plaintiff's breasts were exposed during a medical procedure, then proceeded to speak to her in an offensive manner while ignoring her pleas to leave. After plaintiff reported the incident and Lewis had been warned not to contact plaintiff, Lewis called Neal at her home, informing her, in a "creepy" manner (ECF 33-12 at 10 (Tr. at 37)), that he was the person involved in the incident. "[I]mmediately after," Neal developed "psychological concerns." ECF 33-11 at 9. Although Neal testified that she had some anxiety about visiting doctors prior to the incidents, she had not experienced a panic attack, sleeplessness, paranoia, hopelessness, or depression before August 2017. ECF 33-12 at 16-17 (Tr. at 62-65). Nor had she seen a mental health professional prior to the incidents, with the exception of a marriage counselor. *Id*. (Tr. at 61, 65).

Neal's psychological symptoms, and their alleged connection to Lewis's conduct, are within the "common experience, knowledge and observation of laymen." *Wilhelm*, 230 Md. at 99, 185 A.2d at 719. To be sure, a factfinder could conclude that, given what occurred, the claims of psychological trauma are not causally connected to the incidents or are exaggerated. At this stage of the proceedings, however, it is not the province of the court to judge credibility.

Plaintiff also asserts claims for "inconvenience" and generic "pain and suffering." ECF 33-11 at 7. And, she seeks to recover for her marital issues, as discussed by Neal at her deposition. ECF 33-12 at 16 (Tr. at 62).

The Government did not specifically attack Neal's claim for damages for inconvenience. Inconvenience may be compensable under the umbrella of noneconomic damages. *See, e.g.*, *Price v. Atlantic Ro-Ro Carriers*, 45 F. Supp. 3d 494, 503 (D. Md. 2014) (citing Md. Code (2020 Repl. Vol., 2021 Supp.), § 11-108 of the Courts and Judicial Proceedings Article).

As noted, Neal's testimony suggests that her claim for inconvenience damages is related to having to go through litigation. ECF 33-12 at 16 (Tr. at 62). But, "[i]n Maryland, '[t]he general rule is that costs and expenses of litigation, other than the usual and ordinary Court costs, are not recoverable in an action for [compensatory] damages.'" *Hess Const. Co. v. Bd. of Educ. of Prince George's Cty.*, 341 Md. 155, 159, 669 A.2d 1352, 1354 (1996) (quoting *Collier v. MD–Individual Practice Ass'n*, 327 Md. 1, 11, 607 A.2d 537, 542 (1992)) (alterations in *Hess*). As for the inconvenience and pain and suffering, insofar as these injuries stem from the physical injuries for which expert testimony is required, then expert testimony is required for them as well. Conversely, insofar as they stem from the psychological injuries for which expert testimony is not required, then expert testimony is not required for causation as to them.

As for the marital issues, Neal essentially claims that the injuries caused by the August 2017 incidents contributed to a breakdown in her marriage, and ultimately her divorce from her husband, who was her "only support system." ECF 33-12 at 18 (Tr. at 70); *see id.* (Tr. at 70-72). Such a claim sounds in loss of consortium, which "arises from the loss of society, affection, assistance, and conjugal fellowship suffered by the marital unit as a result of the physical injury to one spouse through the tortious conduct of a third party." *Oaks v. Connors*, 399 Md. 24, 33-34,

660 A.2d 423, 428 (1995); *see also Owens-Illinois, Inc. v. Cook*, 386 Md. 468, 487, 872 A.2d 969, 980 (2005); *Deems v. Western Md. Railway Co.*, 247 Md. 95, 115, 231 A.2d 514, 525 (1967).

The Fourth Circuit, applying Maryland law, has held that in a loss of consortium claim, the testimony of the spouses themselves is sufficient, and medical testimony is unnecessary, as to the "emotional problems and marital difficulties stemming from the injuries to the [spouse]," although in that case it does not appear that the connection of the injuries to the underlying accident was disputed. *Maxworthy v. Horn Elec. Service, Inc.*, 452 F.2d 1141, 1144 (1972). However, Neal has not brought a loss of consortium claim, which "must be filed jointly by a couple and tried concurrently with the claim of the physically injured spouse in order to avoid duplication of awards." *Oaks*, 399 Md. at 34, 660 A.2d at 428. Moreover, the issue of foreseeability would seem to favor the Government. The Government is entitled to summary judgment to any claims or damages stemming from Neal's asserted marital difficulties.

Neal's second claim is for intrusion upon seclusion, which falls within the broader category of torts for invasion of privacy. *See Bailer v. Erie Ins. Exchange*, 344 Md. 515, 525-27, 687 A.2d 1375, 1380-81 (1997). As such, it is an intentional tort. *See id*. (citing Restatement (Second) of Torts § 652B (Am. Law. Inst. 1977) (the "Restatement")). And, "'[w]hile it is necessary to prove actual damages to obtain a recovery in negligence actions, the same rule does not apply to intentional torts. For example, a plaintiff who proves a prima facie case for an intentional tort, but fails to prove damages, will always be allowed to obtain at least a nominal recovery.'" *Johnson v. Valu Food, Inc.*, 132 Md. App. 118, 126, 751 A.2d 19, 23 (2000) (quoting *Bugg v. Brown*, 251 Md. 99, 104, 246 A.2d 235 (1968)) (alteration added).

Nevertheless, the Government argues that Neal's failure to establish a causal link between the incidents in question and her asserted injuries via expert testimony "precludes her from

Case 1:19-cv-01033-MJM   Document 68   Filed 04/19/22   Page 40 of 67


presenting damages testimony on her intrusion upon seclusion claims." ECF 33-1 at 11. The parties appear to accept this framework; in her Opposition, Neal does not attempt to distinguish her intrusion upon seclusion claim, but instead mounts a general response to the Government's argument as to expert testimony. *See* ECF 38 at 15-19.

Maryland case law applying these principles to invasion of privacy torts is scant. However, there are decisions applying *Wilhelm* outside of the typical negligence context. *See, e.g.*, *Bean v. Dep't of Health and Mental Hygiene*, 406 Md. 419, 432-34, 959 A.2d 778, 787-87 (2008) (factual dispute in commitment proceeding); *Tully*, 250 Md. at 436-37, 244 A.2d at 214-15 (malicious prosecution). And, as a general principle, "[i]n any tort action, the plaintiff must establish that the defendant's tortious conduct was a cause in fact of the injury for which compensation is sought . . . . In addition, the plaintiff must establish that any damages sought are a 'natural, proximate and direct effect of the tortious misconduct.'" *Med. Mut. Liability Soc. of Md. v. B. Dixon Evander and Assocs., Inc.*, 339 Md. 41, 54-55, 660 A.2d 433, 439 (1995) (internal citation omitted).

I conclude that where expert testimony is required to establish causation as to Neal's negligence claim, it is also required to recover damages for the alleged injuries pertaining to Neal's intrusion upon seclusion claim.

## 4.

To the extent that expert testimony is required, the question is whether the Government is entitled to summary judgment or, instead, whether Neal should be provided time to designate an expert, as she requests. ECF 38 at 19. Neal notes that this case has not been set for trial. But, this Court customarily does not set a trial date until the resolution of dispositive motions, to avoid clogging the calendar with trial dates that may not be necessary. She also points to Fed. R. Civ.

P. 26(a)(2)(D)(i), which provides that expert disclosures must be made at least 90 days before the date set for trial. But, she overlooks that this provision is subject to any deadlines otherwise ordered by the Court. Fed. R. Civ. P. 26(a)(2)(D). And, in the Scheduling Order, the Court explicitly set the deadline of March 9, 2020, for Rule 26(a)(2) expert disclosures, which it later extended to February 12, 2021. ECF 18 at 1; ECF 30. These deadlines passed without any designation of experts by Neal.

If the Court were to grant Neal's request, it would certainly lead to a significant delay in the readiness of the case for trial. Assuming plaintiff could locate an expert, it is likely that the defense would then require time to designate an expert. And, typically, experts are deposed. Thereafter, even assuming no challenges under F.R.E. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, the defense might well seek another opportunity to move for summary judgment, with the attendant delays for full briefing and time required for the court to rule.

Modification of a scheduling order requires good cause. Fed. R. Civ. P. 16(b)(4). The "'touchstone'" of Rule 16(b)(4)'s "good cause requirement is 'diligence.'" *Faulconer v. Centra Health*, 808 Fed. App'x 148, 152 (4th Cir. 2020) (citation omitted). Indeed, "only diligent efforts to comply with the scheduling order can satisfy Rule 16's good cause standard." *Id*. at 152. The Fourth Circuit has endorsed this proposition several times, in line with other circuits. *Id*. at 152 n.1 (collecting cases). Accord *Rassoull v. Maximus, Inc*., 209 F.R.D. 372, 374 (D. Md. 2002) ("Lack of diligence and carelessness are 'hallmarks of failure to meet the good cause standard.'") (citation omitted). In addition, courts may also consider "whether the moving party acted in good faith, the length of the delay and its effects, and whether the delay will prejudice the non-moving party." *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 520 (D. Md. 2014). However, "'[i]f the movant

has not been diligent in meeting the scheduling order's deadlines,' then other factors . . . generally will not be considered.'" *Faulconer*, 808 Fed. App'x at 152 (quoting *Kmak v. Am. Century Cos., Inc.*, 873 F.3d 1030, 1034 (8th Cir. 2017)).

Neal's cursory request for permission to designate an expert or experts offers no argument as to diligence, good cause, or why plaintiff did not attempt to designate an expert earlier. Discovery in this case lasted a total of 17 months.  Obviously, Neal would have known that she has the burden of proving each element of her claims, including causation and damages, and including at the summary judgment stage.  It could not have been a surprise, in the context of this case and plaintiff's claims, that these issues would be critical.  Yet, she cavalierly ignores that the designation of experts at this late stage in the progress of the case would require the defense to alter its trial strategy; depose any newly designated experts; and obtain its own experts.  This would likely lead to additional motions, which would require briefing and rulings by the court.

In sum, Neal offers no persuasive argument as to why she should be given a second bite at the expert apple.  And, without an expert, the Government is entitled to summary judgment as to both Count 1 and Count 2 with respect to any claims or damages related to the following injuries: the exacerbation of Neal's Crohn's disease; severe chronic fatigue syndrome and fibroids; gastrointestinal illness; the worsening abdominal pain; the miscarriage; the lump in Neal's breast; neurological issues; short term memory issues; the ear issues, including internal ear pain, itching, tinnitus, ringing ears, and discharge; the general bodily illness; inconvenience and pain and suffering, insofar as they stem from these injuries; and marital difficulties.  *See, e.g.*, *Osunde*, 281 F.R.D. at 263-64 ("Because the cause of Joshua Osunde's death, relative to the motor vehicle accident, is a complicated medical question requiring expert testimony, and because Plaintiffs have failed to supply any such evidence, Plaintiffs are unable to establish the proximate cause element

of their wrongful death suit. . . . As a result, Plaintiffs are unable to establish a prima facie case for wrongful death under Maryland law. Therefore, insofar as Defendant's motion in limine is construed as a motion for partial summary judgment, summary judgment is granted in Defendant's favor."); *Skevofilax*, 396 Md. at 443, 914 A.2d at 135-36 ("Despite three amended scheduling orders, and approximately 11 months allotted to conduct discovery, Respondents failed to produce an expert who could testify to specific causation within a reasonable degree of scientific certainty. Without such an expert, Respondents' claims must fail as a matter of law.").

### B. Damages

### 1.

As noted, plaintiff claims $150,000 in economic damages and $2 million in non-economic damages. ECF 33-11 at 8. The Government argues that because plaintiff has failed to respond to discovery requests for itemized damages, and has failed to itemize, document, or substantiate her damages claims, it is entitled to summary judgment as to damages. ECF 33-1 at 7-8. As part of this argument, the Government contends that plaintiff's failure to comply with Fed. R. Civ. P. 26(a)(1)(A)(iii), and her failure to respond to discovery requests concerning the substantiation of damages, precludes her from recovering damages. *Id*. at 7-8; ECF 45 at 2-3.

"Compensatory damages can be divided into 'economic' and 'noneconomic damages.'" *Eastern Shore Title Co. v. Ochse*, 453 Md. 303, 354, 160 A.3d 1238, 1256 (2017). Economic damages are sometimes referred to as "pecuniary" damages. *Choudhry v. Fowlkes*, 243 Md. App. 75, 85, 219 A.3d 107, 113 (2019), *aff'd*, 472 Md. 688, 243 A.3d 298 (2021). Economic damages refer to those which "'will not be awarded without proof of pecuniary loss.'" *Eastern Shore Title Co.*, 453 Md. at 354, 160 A.3d at 1256 (quoting Restatement, § 905). And, "economic damages . . . must be established with reasonable certainty." *Choudhry*, 243 Md. App. at 101, 219 A.3d at

122 (reversing award of $500,000 in economic damages in wrongful death claim). *See Nat. Prod. Sols., LLC v. Vitaquest Int'l, LLC*, CCB-13-436, 2014 WL 6383482, at *6 (D. Md. Nov. 13, 2014) (To be recoverable, economic damages must be proven "'with reasonable certainty, and may not be based on speculation or conjecture.'") (quoting *Asibem Assocs., Ltd. v. Rill*, 264 Md. 272, 276, 286 A.2d 160, 162 (Md. 1972)).

It is the plaintiff's burden to prove damages through the use of evidence such as "receipts, copies of checks, or any other means of computation that would allow a factfinder to value his claimed loss." *Nguti v. Safeco Ins. Co.*, PX-15-742, 2017 WL 2778821, at *4 (D. Md. Jun. 27, 2017) (granting summary judgment on actual damages due to lack of documentation). "In contrast, '[c]ompensatory damages that may be awarded without proof of pecuniary loss[, i.e. noneconomic damages,] include compensation (a) for bodily harm, and (b) for emotional distress.'" *Eastern Shore Title Co.*, 453 Md. at 354, 160 A.3d at 1256 (quoting Restatement, § 905) (alterations in *Eastern Shore Title Co.*).

As best as I can determine, the Government seeks summary judgment only as to the claims for economic damages. Initially, the Motion refers generally to summary judgment with respect to damages. ECF 33 at 1; ECF 33-1 at 7. However, most of the argument pertains to economic damages. ECF 33-1 at 7-8. And, in the Government's Reply, the title for the relevant section of the brief is as follows: "Plaintiff's failure to calculate economic damages precludes her from recovering economic damages." ECF 45 at 2. Moreover, the argument focuses exclusively on economic damages. *Id.* at 2-3. Therefore, it would seem that the Government is only seeking summary judgment as to economic damages.

**2.**

Neal's substantiation of her claim for economic damages has fallen woefully short.  As shown previously, Neal has not identified a single dollar figure or produced any documentation as to the basis for the specific claim of $150,000 in economic damages.[13]

Part of the Government's argument is premised on Fed. R. Civ. P. 26(a)(1)(A)(iii),  which requires a party to provide, in its initial disclosure, "a computation of each category of damages claimed by the disclosing party," as well as to "make available for inspections and copying . . . the documents or other evidentiary material . . . on which each computation is based, including materials bearing on the nature and extent of the injuries suffered."  But, as noted, this requirement is subject to any orders by the Court, and the Scheduling Order in this case waived the Rule 26(a)(1) initial disclosure requirements.  *See* ECF 18 at 2.[14]  Nevertheless, Neal provided initial disclosures, which contained only the following description of her damages, under "Relief Sought:" "Compensatory damages for pain and suffering in the amount of two million dollars ($2,000,000) and economic damages in the amount of $50,000."  ECF 33-9 at 4-5.

Neal offered little detail during discovery.  In response to the Government's interrogatory asking Neal to itemize and particularize her economic and non-economic damages, Neal claimed "diverse non-economic damages," and thereafter provided a long list of medical conditions, as discussed earlier.  ECF 33-11 at 7-8.  Although she claimed $150,000 in economic damages, she

---

[13] The closest Neal comes in her Opposition to identifying any documentation is an assertion that she "produced documentation showing that Lewis [sic] conduct had caused her damages including her medical records which substantially cited to the August 2017 incident with Grant Lewis." ECF 38 at 20. No such medical records have been provided to the Court. Regardless, Neal does not claim that these medical records indicate any specific costs or expenses, only that they show that Lewis's conduct caused her damages.

[14] Curiously, neither party pointed out this fact in briefing related to their obligations under Rule 26(a)(1).

included no itemization of specific costs or expenses pertaining to such damages. *Id.* In response to another interrogatory seeking specific information as to payments she made for medical treatment in connection with her injuries, Neal vaguely asserted "several out-of-pocket costs incidental to receiving medical treatment and prescription medications," without providing any details or amounts. *Id.* at 9-10. She acknowledged her "medical treatment has been paid for" by the VA. *Id.* at 10.

As mentioned, at her deposition, Neal testified that in response to her concerns about her security and safety, she purchased "the most expensive phone" so that she could ascertain the identity of the caller and she "added some extra cameras" at her home. ECF 33-12 at 19 (Tr. at 73). She also testified that she had paid "partially out of pocket" for her therapy sessions. *Id.* (Tr. at 73-74). Again, however, plaintiff mentioned no specific costs, nor did she provide any documentation or specific information as to these expenses.

So, to summarize, Neal claims $150,000 in economic damages. Yet, she has never explained how this figure has been calculated. And, she has never offered evidence or amounts associated with any expense that might support this claim. Although Neal pointed to two specific categories of expenses—her new phone and cameras and some out-of-pocket medical expenses—she only did so in a vague way.

In her Opposition, Neal asserts that she "elaborately participated in discovery and disclosed categories of her damages during depositions and responses to interrogatories." ECF 38 at 20. This argument is not persuasive. As noted, the Opposition cites medical records as to Neal's injuries. *Id.* However, these were not produced as exhibits. And, based on the parties' descriptions, they do not appear to contain costs or expenses. *See id.*; ECF 45 at 3. Otherwise, the Opposition merely points to Neal's interrogatory and deposition answers, which are inadequate,

46

for the reasons stated.  The Opposition never attempts to quantify or document the costs allegedly incurred, nor does Neal suggest that such information might be forthcoming.

Plaintiff's failures in this regard are particularly noteworthy, given that her initial disclosures specifically asserted that "[a]ll financial records relating to Neal's economic losses as a result of Defendant's conduct are in the custody and control of Plaintiff Tiffany Neal."  ECF 33-9 at 3.  Also notable is the steady increase in claimed economic damages—from $10,000 in the Complaint (ECF 1, ¶¶ 49, 53), to $50,000 in the initial disclosures (ECF 33-9 at 4), to $150,000 in Neal's subsequent interrogatory responses (ECF 33-11 at 8)—without any explanation or documentation to justify such an increase.  *See Nguti*, 2017 WL 2778821, at *5 n.1 (increase in plaintiff's claim by $3,000 "rais[es] additional suspicion that plaintiff could not prove loss with 'reasonable certainty.'"); *Natural Product Solutions, LLC v. Vitaquest Int'l, LLC*, CCB-13-436, 2014 WL 6383482, at *8 (D. Md. Nov. 13, 2014) ("vacillation" in claimed damages "evidences a lack of reasonable certainty").

Plaintiff's failure to produce any specific evidence of expenses or costs flies in the face of the requirement that economic damages must "be established with reasonable certainty."  *Choudhry*, 243 Md. App. at 101, 219 A.3d at 122.

**3.**

The question is whether Neal's failure to support her claim for economic damages entitles the Government to summary judgment in its favor on the issue of economic damages.  The Government's complaints as to discovery are unavailing.  The Government did not bring a motion to compel discovery under Rule 37(a).  Although Rule 37(b) contemplates a variety of discovery sanctions, they apply only if a party "fails to obey an order to provide or permit discovery," and no such order has been entered in this case.  *See* Fed. R. Civ. P. 37(b)(2)(A).

Rule 37(c)(1) provides: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." But, as to Rule 26(a), initial disclosure requirements were waived. So, plaintiff cannot be penalized on that basis. And, Rule 26(e), in this context, refers to the parties' continuing obligation to supplement and correct their Rule 26(a) disclosures. *See* Fed. R. Civ. P. 26(e).

The more fundamental issue is Neal's failure to produce evidence as to her claim of economic damages. It is plaintiff's burden to prove her damages with reasonable certainty, and economic damages will not be awarded without proof of pecuniary loss. *Nguti*, 2017 WL 2778821, at *4 (plaintiff's burden to provide damages through the use of evidence "that would allow a factfinder to value his claimed loss"); *Nat. Prod. Sols., LLC*, 2014 WL 6383482, at *8 (To be recoverable, economic damages must be proven "with reasonable certainty, and may not be based on speculation or conjecture." (quoting *Asibem Assocs., Ltd*, 286 A.2d at 162)); *Eastern Shore Title Co.*, 453 Md. at 354, 160 A.3d at 1256 (economic damages "will not be awarded without proof of pecuniary loss." (quoting Restatement, § 905)); *Choudhry*, 243 Md. App. at 101, 219 A.3d at 122 ("[E]conomic damages . . . must be established with reasonable certainty."); *Owens-Corning v. Walatka*, 125 Md. App. 313, 326, 725 A.2d 579, 585 (1999) ("Maryland cases have often recognized a plaintiff's burden to prove a *prima facie* cause of action and damages."), *abrogated on other grounds by John Crane, Inc. v. Scribner*, 369 Md. 369, 800 A.2d 727 (2002).

Where the nonmovant bears the burden of proof at trial, the moving party may show that it is entitled to summary judgment by citing to evidence in the record, or by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case."

*Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).  The Government has done so in its Motion, pointing to an absence of evidence as to economic damages.  ECF 33-1 at 7-8.

Thus, the burden shifts to Neal to "'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat*, 346 F.3d at 522 (quoting former Fed. R. Civ. P. 56(e)).  And, Neal has failed to do so.  As discussed, Neal's failure to itemize or substantiate her economic damages has been particularly blatant.  Over the course of this litigation, Neal's economic damages claims have increased substantially, from $10,000 in the Complaint, then to $50,000 in her initial disclosures (ECF 33-9), and ultimately to $150,000 in answers to interrogatories.  ECF 33-11.  Furthermore, Neal explicitly represented that she possessed all records as to her economic losses.  ECF 33-9 at 3.

To support the $150,000 claim, Neal has cited two categories of such expenses:  out-of-pocket medical expenses, and her expenses pertinent to personal security (camera and phone).  But, according to the Government, she has never produced any documentation as to such expenses.  *See* ECF 33-11 at 9-10.  As the Government has noted: "Defendant is left with no inkling as to how Plaintiff calculated and apportioned her damages and has no way to ascertain the degree of certainty with which those damages were determined."  ECF 33-1 at 8.  Nor has Neal suggested that she could cure this issue through further disclosure.

Although noncompliance with Rule 26(a) is not at issue here, cases discussing violations of Rule 26(a) illustrate the requirement of proof of damages, and the consequences of not offering such evidence.  For example, in *Al-Sabah v. Agbodjobe*, SAG-17-730, 2020 WL 354761 (D. Md. Jan. 19, 2020), which is cited by the Government, Judge Gallagher barred the defendant from presenting any damages evidence for his negligent misrepresentation counterclaim under Rule 37(c)(1) for failure to itemize under Rule 26(a).  *Id*. at *1.  On a subsequent motion for summary

judgment, Judge Gallagher granted summary judgment to the plaintiff as to the defendant's counterclaim, because the defendant could not offer damages evidence and actual damages are a prerequisite for negligent representation.  *Id*. at *2-3.  In *Contech Stormwater Solutions, Inc. v. Baysaver Technologies, Inc.*, 534 F. Supp. 2d 616 (D. Md. 2008), Judge Blake excluded a variety of belatedly submitted evidence, including as to damages for the defendants' business tort counterclaims, because of violations of Rule 26(a).  *Id*. at 623-25.  She then determined that the plaintiff was entitled to summary judgment on the counterclaims, because without this evidence, the defendants could not factually support the elements of their claims.  *Id*. at 625.

In *Silver State Broadcasting, LLC v. Beasley FM Acquisition*, No. 2:11-CV-01789-APG, 2016 WL 320110 (D. Nev. Jan. 25, 2016), the court granted the defendants' motions in limine to preclude the plaintiffs from offering damages evidence at trial for failure to compute damages under Rule 26(a)(1).  *Id*. at *2-5.  Simultaneously, the court granted the defendants' motion for summary judgment, because there was no evidence as to the element of damages, which was essential to the claim of breach of fiduciary duty.  *Id*. at *1.

The Government also cites *Donnert v. Feld Entertainment, Inc.*, 612 Fed. App'x 657 (4th Cir. 2015), a breach of contract case.  There, the Fourth Circuit affirmed the district court's decision to grant a motion in limine excluding all evidence and testimony as to the plaintiffs' out-of-pocket expenses as a discovery sanction, for failure to respond to an interrogatory.  *Id*. at 663-64.  The plaintiffs were thus prevented from proving these damages.  *Id*. at 663.  However, this case is not quite on point, as this exclusion was the result of a discovery motion, rather than in the context of summary judgment.

Based on plaintiff's abject failure to show any pecuniary loss, Neal has failed to demonstrate any basis as to a viable claim for economic damages.  Therefore, the Government is

entitled to summary judgment on this claim.  Precluding evidence of economic damages at trial is part of the court's "'affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial.'"  *Bouchat*, 346 F.3d at 526 (quoting *Drewitt*, 999 F.2d at 778-79).  And, a reasonable factfinder could not award economic damages to Neal in the absence of evidence as to pecuniary loss.  *Cf., e.g.*, *Eastern Shore Title Co.*, 453 Md. at 354, 160 A.3d at 1256 (economic damages "'will not be awarded without proof of pecuniary loss.'" (quoting Restatement, § 905)); *Owens-Corning*, 125 Md. App. at 326, 725 A.2d at 585 ("Maryland cases have often recognized a plaintiff's burden to prove a *prima facie* cause of action and damages.").

**4.**

The Government does not appear to challenge Neal's non-economic damages.  And, this is with good reason.  Exclusion of evidence as to non-economic damages is not appropriate.  Non-economic damages are necessarily more difficult to compute with any certainty.  Such damages do not require "proof of pecuniary loss."  *Eastern Shore Title Co.*, 453 Md. at 354, 160 A.3d at 1256 (quoting Restatement, § 905); *see also Meunstermann by Muenstermann v. United States*, 787 F. Supp. 499, 527 (D. Md. 1992) ("The full extent of nonpecuniary damages is difficult to measure. The amorphous nature of the subject and the infinite variables that come into play make it impossible for courts to fashion any precise rule."); *McAlister v. Carl*, 233 Md. 446, 451, 197 A.2d 140, 143 (1964) ("The difficulty of attaining certainty in the amount of damages for harms to body, feelings and reputation is clearly recognized . . . .").  And, Neal has furnished evidence as to her claim for non-economic damages.  *See, e.g.*, ECF 33-11 at 7-8.

Therefore, the Court will grant summary judgment to the Government only as to economic damages, both as to Count 1 and Count 2.

### C.  Intrusion Upon Seclusion

Neal alleges that *both* the exam room incident and the subsequent phone calls constitute intrusion upon seclusion.  The Government argues that it is entitled to summary judgment with respect to Neal's claim for intrusion upon seclusion (Count 2), "to the extent it arises from the allegation that Mr. Lewis 'repeatedly' made 'harassing phone calls to Neal's home.'"  ECF 33-1 at 11-12.  It contends that Neal has not shown that the alleged phone calls "were highly offensive to a reasonable person."  *Id.* at 6.  Neal responds that, based on the record, she has satisfied the elements of the claim for intrusion upon seclusion as to the incident of August 7, 2017, including the subsequent telephone calls made by Lewis.  ECF 38 at 20-23.

"Intrusion upon seclusion is one of the torts under invasion of privacy."  *Demo v. Kirksey*, PX-18-00716, 2018 WL 5994995, at *3 (D. Md. Nov. 15, 2018) (citing *Pemberton v. Bethlehem Steel Corp.*, 66 Md. App. 133, 161, 502 A.2d 1101, 1115 (1986)).  Intrusion upon seclusion occurs where there is an "intentional intrusion upon the solitude or seclusion of another or her private affairs or concerns that would be highly offensive to a reasonable person."  *Furman v. Sheppard*, 130 Md. App. 67, 73, 744 A.2d 583, 585 (2000) (citing Restatement § 652B); *see Gamble v. Fradkin & Weber, P.A.*, 846 F. Supp. 2d 377, 383 (D. Md. 2012); *see Lipscomb v. Aargon Agency, Inc.*, PWG-13-2751, 2014 WL 5782040, at *2 (D. Md. Nov. 5, 2014); *Bailer v. Erie Ins. Exch.*, 344 Md. 515, 525-26, 687 A.2d 1375, 1380-81 (1997); *Mitchell v. Balt. Sun Co.*, 164 Md. App. 497, 522, 883 A.2d 1008, 1022 (2005).

"A trespass 'becomes relevant only when it invades a defendant's reasonable expectation of privacy.'"  *Furman*, 130 Md. App. at 74, 744 A.2d at 586 (citation omitted).  Conduct that a particular plaintiff finds offensive, but that would not offend a reasonable person, cannot establish intrusion upon seclusion.  *Whye v. Concentra Health Servs., Inc.*, ELH-12-3432, 2013 WL 5375167, at *14 (D. Md. Sept. 24, 2013), *aff'd*, 583 Fed. App'x 159 (4th Cir. 2014).  Rather,

intrusion upon seclusion requires a "'substantial'" intrusion, judged by an objective reasonableness standard; it is irrelevant whether a particular plaintiff subjectively found conduct to be highly offensive. *Id.* at *14 (quoting Restatement § 652B, cmt. d). Moreover, "[a]n intrusion upon seclusion claim requires that the matter into which there was an intrusion is entitled to be private and is kept private by the plaintiff." *Barnhart v. Paisano Pubs., LLC*, 457 F. Supp. 2d 590, 593 (D. Md. 2006); *accord Fletcher v. Price Chopper Foods of Trumann, Inc.*, 220 F.3d 871, 877 (8th Cir. 2000) ("A legitimate expectation of privacy is the touchstone of the tort of intrusion upon seclusion.").

In *Dorris v. Accounts Receivable Management, Inc*., GLR-11-3453, 2013 WL 1209629, at *9 (D. Md. Mar. 22, 2013), the court explained: "[T]he Maryland Court [of Appeals] established two factors to be considered in determining whether the evidence is sufficient to establish a jury question for invasion of privacy: (1) whether the frequency of the communication indicates a pattern of harassment; or, if the communication is 'not of such frequency as to constitute harassment,' (2) whether the communication possesses a 'vicious quality.'" (quoting *Household Fin. Corp. v. Bridge*, 252 Md. 531, 541, 250 A.2d 878, 884 (1969)).

As noted, I consider Neal's intrusion upon seclusion claim only with respect to the telephone calls, because the Government attacks solely that portion of her claim at summary judgment. Most of the law as to repeat phone calls as a basis for an intrusion upon seclusion claim has been developed in the context of debt collection. The Restatement, § 652B, cmt. d, provides:

> There is likewise no liability unless the interference with the plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reasonable man would strongly object. Thus there is no liability for knocking at the plaintiff's door, or calling him to the telephone on one occasion or even two or three, to demand payment of a debt. It is only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff, that becomes a substantial burden to his existence, that his privacy is invaded.

In the light most favorable to Neal, the record reflects that Lewis was temporarily reassigned to make scheduling calls after the incident of August 7, 2017.  ECF 33-4.  In that role, he called Neal at her home on August 10, 2017, despite his being advised not to have any contact with Neal, and recognized her as the patient involved in the incident of August 7.  ECF 33-3 at 3, 17.  Neal testified she found it "odd" to receive a call regarding scheduling a stress test, but she testified that she did, in fact, need an appointment for the test.  ECF 33-12 at 9 (Tr. at 35).

At some point in the call, after Neal and Lewis had been discussing scheduling arrangements, Lewis revealed himself as "the guy" involved in the August 7 incident.  ECF 33-3 at 8, 17; ECF 33-12 at 8 (Tr. at 31).  According to Neal, she perceived his comments as "creepy and chilling."  ECF 33-12 at 10 (Tr. at 37).

After Lewis identified himself, Neal hung up in "disbelief" because she was so angry.  ECF 33-12 at 8 (Tr. at 32), 10 (Tr. at 38).  Lewis then called back right away, Neal answered, and Lewis began to apologize.  *Id*. at 8 (Tr. at 32), 10 (Tr. at 38).  Neal told him that she accepted the apology, but that his behavior was "not okay" and that he must have "mental issues."  *Id*. at 8 (Tr. at 32), 10 (Tr. at 38).  She then hung up.  *Id*. at 10 (Tr. at 38-40), 13 (Tr. at 51-52).  However, Lewis called back a third time, and on that third call she told him not to contact her anymore.  *Id*. at 10 (Tr. at 38-40), 13 (Tr. at 51-52).

As recounted earlier, Neal testified, and continues to argue (*see* ECF 38 at 23), that Lewis contacted her a number times after their conversation on August 10, 2017.  But, she never spoke to Lewis, nor did he leave any message.  ECF 33-12 at 11 (Tr. at 44).  Moreover, she testified that she did not recognize any of the phone numbers for the calls, yet she attributes them to Lewis.  *Id*. at 11-13 (Tr. at 41-54).  In other words, she assumed that whenever she received a phone call from a number she did not recognize, the call was from Lewis.  *Id*. at 12 (Tr. at 45-46), 14 (Tr. at 53).

She testified that she wasn't "paying attention" to the phone number for these subsequent calls. *Id*. at 11 (Tr. at 43).

As the Government observes, Maryland courts have not found intrusion upon seclusion even when a plaintiff received multiple unwanted phone calls.  *See*, *e.g.*, *Awah v. Wells Fargo Dealer Servs., Inc.*, No. 1872, 2019 WL 410412, at *2 (Md. Ct. Sp. App. Jan. 31, 2019); *see also Gamble*, 846 F. Supp. 2d at 383 (asking whether defendant "conduct[ed] himself or herself in a highly offensive manner").  In *Household Finance Corp. v. Bridge*, 252 Md. 531, 250 A.2d 878 (1969), for example, the Maryland Court of Appeals rejected the contention that "five or six phone calls to the [plaintiff from the defendant], and two or three to her parents (who actually signed the note), over a period of eleven months, constituted a pattern of harassment" justifying an intrusion claim.  *Id*. at 542, 250 A.2d at 885.  The court contrasted these facts with out-of-state cases upholding a claim where, for example, a creditor's agent made three calls to the debtor's family members, suggesting an illicit relationship; or where the creditor called the debtor six to eight times a day for three weeks, including late at night, and also called the debtor's workplace, resulting in a threat of loss of employment.  *Id*. at 540-41, 250 A.2d at 884-85.

In *Summit Loans, Inc. v. Pecola*, 265 Md. 43, 288 A.2d 114 (1972), the Maryland Court of Appeals upheld the trial court's decision not to direct a verdict in favor of the defendant in an intrusion upon seclusion claim.  In that case, the creditor's representatives called the plaintiff at home over 200 times in a six-month period, averaging between 20-30 calls per week, including late at night, and used threatening and vulgar language towards the plaintiff and her young daughter.  *Id*. at 46-49, 288 A.2d at 115-17.[15]  And, more recently, in *Awah*, 2019 WL 410412, on

---

[15] The defendant in *Summit Loans* contested this version of events, but at the procedural posture in question, the court assumed the truth of the testimony of the non-moving party. 265 Md. at 46, 288 A.2d at 115.

an intrusion upon seclusion claim, the plaintiff and his wife testified that the defendant called the plaintiff 15 to 17 times as to the plaintiff's loan, including sometimes three times a day. *Id*. at *1. Yet, the Maryland Court of Special Appeals upheld the circuit court's ruling in favor of the defendant on a motion for judgment after the close of plaintiff's case. *Id*. at *2.

At most, on August 10, 2017, Lewis called Neal three times in a short period, essentially as part of a single conversation. The three phone calls at issue could not be regarded as highly offensive to a reasonable person. In the first call, Lewis scheduled a necessary stress test appointment for plaintiff. ECF 33-12 at 9 (Tr. at 35). Although plaintiff was not expecting the call, she has testified that she needed the stress test, and that Lewis's duties for August 10, 2017, included calling plaintiff to schedule the test. *Id.*; ECF 33-3 at 5. In the second call to plaintiff, Lewis identified himself and apologized to plaintiff. ECF 33-12 at 8 (Tr. at 32). Plaintiff accepted the apology. *Id.* As the Government puts it, ECF 33-1 at 13: "It is difficult to conceive of a reasonable person who would find an apology to be 'highly offensive,' warranting summary judgment." And, plaintiff merely assumes that every unrecognized phone call she received after August 10, 2017, was from Lewis. To be sure, Lewis's conduct in calling Neal after the incident of August 7, 2017, was ill advised. But, as to these calls, plaintiff has not met the burden to sustain an intrusion upon seclusion claim.

Lewis then asserts that there was a series of calls to her, but she never answered them. Even assuming that the additional, unanswered calls were from Lewis, the calls do not establish a pattern of harassment. They featured neither the frequency nor the abusive content seen in the cases in which an intrusion upon seclusion claim was upheld. For example, the calls fall far short of the 20-30 calls per week in *Summit Loans*, 265 Md. at 46-39, 288 A.2d at 115-17, including calls late at night and with threatening and vulgar language. Likewise, the calls are not similar to

those in the cases cited in *Household Finance Corp.*, 252 Md. at 540-41, 250 A.2d at 884-85, as upholding an intrusion claim, which involved calls to family members suggesting an illicit relationship; calls six to eight times a day, including late at night; and calls to the debtor's workplace, resulting in a threat of loss of employment.

In *Awah*, 2019 WL 410412, where an intrusion upon seclusion claim was rejected, the defendant called the plaintiff 15 to 17 times a day. *Id.* at *1. Lewis's alleged calls in this case do not reach even this level of frequency. And, they have more in common with the five or six phone calls over an eleven-month period in *Household Finance Corp.*, 252 Md. at 540, 250 A.2d at 885, which the Maryland Court of Appeals found did not justify an intrusion claim.

In short, the evidence does not suffice to create a genuine dispute of material fact. Even assuming that Lewis and Neal spoke three times on August 10, 2017, Neal has not advanced any evidence, beyond speculation, that Lewis continued to call her after the third time that they spoke. She and Lewis never spoke again; he never left a message; and she did not recognize any telephone number that she actually knew to be associated with Lewis.

Neal bears the burden of proof at trial. But, on summary judgment, the Government may meet its burden by showing that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B). "[T]o avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial. Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997). As the Fourth Circuit recently said: "'Unsupported speculation is not sufficient to defeat a

summary judgment motion.'"  *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 659 (4th Cir. 2020)

(quoting *Felty v. Graves–Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987)).

"When opposing parties tell two different stories, one of which is blatantly contradicted by

the record, so that no reasonable jury could believe it, a court should not adopt that version of the

facts for purposes of ruling on a motion for summary judgment."  *Scott*, 550 U.S. at 380.  Thus,

even viewing all facts and drawing all reasonable inferences in favor of Neal, I need not credit her

assertion that Lewis called her after the third phone call on August 10, 2017.

Considering the relevant case law, the calls were not "repeated with such persistence and

frequency as to amount to a course of hounding the plaintiff, that becomes a substantial burden to

[her] existence, that [her] privacy is invaded."  Restatement § 652B, cmt. d.  The facts are

insufficient to create a question for trial as to whether Lewis's conduct was an "intentional

intrusion upon the solitude or seclusion of another or her private affairs or concerns that would be

highly offensive to a reasonable person."  *Furman*, 130 Md. App. at 73, 744 A.2d at 585.

Accordingly, I will grant summary judgment to the Government as to the portion of Count 2 that

is based upon Lewis's phone calls to Neal.

## IV.    Negligent Supervision

As noted, the Fourth Circuit's decision in *Lins*, 847 Fed. App'x 159, raises the question of

whether the Court's previous dismissal of plaintiff's negligent supervision count was in error, and,

if so, the appropriate next steps.  The Court agrees with the parties that revision of the Court's

dismissal is appropriate.

The Court's ruling on defendant's motion to dismiss (ECF 14; ECF 15) was an

interlocutory order, because it adjudicated "fewer than all the claims or the rights and liabilities of

fewer than all the parties." Fed. R. Civ. P. 54(b).  And, an order "that adjudicates fewer than all

the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." *Id.* *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983); *Nadendla v. WakeMed*, ___ F.4th ___, 2022 WL 187835, at *2 (4th Cir. Jan. 21, 2022); *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017).

The Fourth Circuit has distinguished between Rule 54(b) and Rule 59(e), which governs reconsideration of final judgments, explaining that Rule 54(b) "involves broader flexibility" to account for new facts and arguments as the litigation unfolds. *See Carlson*, 856 F.3d at 325; *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003). However, the Fourth Circuit has admonished that "the discretion afforded by Rule 54(b) 'is not limitless,'" and the Court has "'cabined revision pursuant to Rule 54(b) by treating interlocutory rulings as law of the case.'" *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*, 899 F.3d 236, 256 (4th Cir. 2018) (quoting *Carlson*, 856 F.3d at 325). Indeed, "allowing litigants a 'second bite at the apple' via a motion to reconsider is disfavored." *Nadendla*, 2022 WL 187835, at *2.

The law of the case doctrine "generally provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Musacchio v. United States*, 557 U.S. 237, 244-45 (2016) (quoting *Pepper v. United States*, 562 U.S. 476, 506 (2011)); accord *Arizona v. California*, 460 U.S. 605, 618 (1983); *Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019); *Carlson*, 856 F.3d at 325; *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009). The doctrine's effect is to bar a party from resurrecting issues that were previously decided or "'decided by necessary implication.'" *United States v. Lentz*, 524 F.3d 501, 528 (4th Cir. 2008) (quoting *Sejman v. Warner-Lambert Co., Inc.*, 845 F.2d 66, 69 (4th Cir. 1988)). In so doing, the law of the case doctrine advances the interests of efficiency, judicial economy,

and finality.  *See Christianson v. Colt Indus. Oper. Corp*., 486 U.S. 800, 816 (1988) (observing that the doctrine safeguards the "efficiency of the judicial process by protecting against the agitation of settled issues"); *United States v. Philip Morris USA Inc*., 801 F.3d 250, 257 (D.C. Cir. 2015) (noting that the law of the case "reflects the understanding that 'inconsistency is the antithesis of the rule of law'") (citation and alteration omitted).

However, when applied to a court's interlocutory rulings, the law of the case doctrine "is not an 'inexorable command' but rather a prudent judicial response to the public policy favoring an end to litigation." *Sejman*, 845 F.2d at 68 (citation omitted).  Accordingly, the Fourth Circuit has instructed that a court may revise an interlocutory order to account for "'(1) a subsequent trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice.'"  *Tobacco Coop*., 899 F.3d at 256 (quoting *Carlson*, 856 F.3d at 325).

Here, plaintiff brought a claim for negligent supervision.  *See* ECF 1, ¶ 37.  In my ruling on the Motion to Dismiss, I concluded that, based on "longstanding Fourth Circuit precedent," that "the FTCA's discretionary function exception bars plaintiff's claims for negligent hiring, retention, and supervision."  ECF 14 at 22 (citing *LeRose v. United States*, 285 Fed. App'x 93, 97 (4th Cir. 2008); *Suter*, 441 F.3d at 309, 312 n.6).  However, as discussed below, the Court's ruling as to negligent supervision was in error, in light of *Lins*.  And, *Lins* is an appropriate basis for the Court to revise its ruling on the Motion to Dismiss.

*Lins* involved a plaintiff who brought claims against the United States under the FTCA based on alleged misconduct of a therapist at the Baltimore Veterans Affairs Medical Center, who had a sexual relationship with her patient.  847 Fed. App'x at 160.  The plaintiff asserted claims of vicarious liability as well as negligent hiring, supervision, and retention.  *Id*.  I rejected the claims and dismissed the suit, concluding that under Fourth Circuit precedent the discretionary

function exception precluded negligent hiring, supervision, and retention claims.  *See Lins v. United States*, ELH-17-2163, 2018 WL 2183393, at *6-8 (D. Md. May 10, 2018), *rev'd*, 847 Fed. App'x 159.  In a two-to-one decision, the Fourth Circuit affirmed in part and reversed in part.

Of import here, the Fourth Circuit concluded in *Lins* that "the discretionary function exception does not categorically bar negligent hiring, supervision, and retention claims." *Lins*, 847 Fed. App'x at 165.  Applying *Gaubert*, 499 U.S. 315, the Court ruled that the discretionary function exception did bar plaintiff's negligent hiring and retention claim, because "the VA does not have any policies dictating how it hires or retains employees" and "the VA's decisions to hire and retain an employee are the type of discretionary decisions that are grounded in public policy." *Lins*, 847 Fed. App'x at 166. In contrast, the Fourth Circuit determined that the discretionary function exception did *not* bar plaintiff's negligent supervision claim, because "the VA had a 'zero tolerance' policy for patient abuse," *id*. at 165, and "the VA acted contrary to a mandatory policy that dictated how it should supervise its employees . . . ." *Id*. at 166.

Specifically, the VA's "zero tolerance" policy against patient abuse prohibited an employee from entering into a non-professional relationship with a patient, as well as, more broadly, "any mistreatment or coercion of a Veteran or beneficiary . . . [including] acts of [a] physical, psychological, verbal, sexual, emotional or financial nature."  ECF 49-1 (the policy) at 1; *Lins*, 847 Fed. App'x at 165.  And, this policy required action against any alleged abuser, including assignment to duties "that do not involve the delivery of patient care to the alleged victim," and instructing the alleged abuser to avoid all contact with the alleged victim.  *Lins*, 847 Fed. App'x at 165.  Because the VA failed to follow this policy, the discretionary function exception could not apply.  *Id*. at 165-66.

61

Surprisingly, the parties never addressed *Lins* in their briefing. But, in response to the Court's inquiry, they now agree that *Lins* requires the Court to revise its ruling. As the Government notes (ECF 49 at 2-3), the relevant policy in this case, "VAMHCS Policy Memorandum, 512-05/HR-010," is similar to the policy at issue in *Lins*. *See* ECF 9-3 (the "Policy Memorandum"). It contains a similar prohibition against patient abuse. *Id*. at 1, 3. This provision specifically references the VA policy at issue in *Lins*, as detailing the "[s]teps for reviewing, reporting, and taking actions to investigate and address alleged abuse." *Id*. at 3. And, the Policy Memorandum contains specific responsibilities for VA leadership and supervisors. *Id*. at 4-6. Neal argues that the VA violated its zero tolerance policy with respect to Lewis, including with its response to his earlier conduct. ECF 50 at 4-7.

I note that the Government's Motion to Dismiss also attacked plaintiff's negligent supervision claim on the grounds that plaintiff had failed to exhaust administrative remedies, in that her administrative claim did not mention negligent supervision. ECF 9 at 12-14. In my ruling on the Motion to Dismiss, I did not address this argument, because I dismissed the negligent hiring, training, and supervision claim under the discretionary function exception. *See* ECF 14 at 23 n.3. If this argument is correct, however, then plaintiff's negligent supervision claim would still fail.

However, it is not correct. One of the conditions of the FTCA's waiver of sovereign immunity is a requirement of notice to the federal agency that employed the alleged tortfeasor. The notice requirement is established by 28 U.S.C. § 2675(a), which provides, with exceptions not relevant here, as follows:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

A notice of claim must include a demand for a sum certain in damages, and a subsequent tort action may "not be instituted for any sum in excess of the amount the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." 28 U.S.C. § 2675(b).  The federal agency cannot hold the claimant in limbo, perpetually awaiting a decision on the claim before suit can be filed, because of the so-called "deemer" clause of § 2675(a): "The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section."

The Fourth Circuit has consistently stated that "the requirement of filing an administrative claim is jurisdictional and may not be waived."  *Henderson v. United States*, 785 F.2d 121, 123 (4th Cir. 1986); accord *Drew v. United States*, 217 F.3d 193, 196 (4th Cir.) ("Where . . . a claim is not first presented to the appropriate agency, the district court must, pursuant to Fed. R. Civ. P. 12(b)(1), dismiss the action for want of subject matter jurisdiction."), *aff'd en banc by equally divided court*, 231 F.3d 927 (4th Cir. 2000), *cert. denied*, 532 U.S. 1037 (2001); *Kokotis v. United States Postal Serv*., 223 F.3d 275, 278 (4th Cir. 2000); *Ahmed v. United States*, 30 F.3d 514, 516 (4th Cir. 1994).

The Government asserted that plaintiff did not raise the issue of negligent hiring, training, or supervision in her administrative claim.  Therefore, the Government maintained that plaintiff failed to satisfy the jurisdictional requirement of claim presentment with respect to this count. *See Ahmed*, 30 F.3d at 516 (observing that the requirement of filing an administrative claim is jurisdictional).  In support of this assertion, the Government attached plaintiff's administrative

63

claim to the Motion to Dismiss.  ECF 9-1 at 1.  And, indeed, plaintiff did not expressly discuss

defendant's negligent hiring, supervision, and/or retention in her administrative claim.  *See id.*

However, plaintiff's failure to do so does not render her claim deficient.  The regulation

concerning the presentment issue states, 28 C.F.R. § 14.2(a): "[A] claim shall be deemed to have

been presented when a Federal agency receives from a claimant ... [a] written notification of an

incident, accompanied by a claim for money damages in a sum certain for injury to or loss of

property, personal injury, or death alleged to have occurred by reason of the incident...."  "This

provision has been interpreted by the courts to indicate that the claimant meets his burden if the

notice (1) is sufficient to enable the agency to investigate and (2) places a 'sum certain' value on

her claim."  *Ahmed*, 30 F.3d at 516-17 (citation and internal quotation marks omitted).

Notably, neither the regulation nor the statute requires the claimant to enumerate any

specific causes of action.  Therefore, I shall not impute such a requirement here.  In my view,

plaintiff's administrative claim gave the Government adequate notice of the incidents giving rise

to this suit.

So, it is appropriate to revive plaintiff's negligent supervision claim.  This raises the

question of the most appropriate next steps.  In its briefing, the Government argues that no

additional discovery is required, because plaintiff took discovery in this area.  ECF 49 at 4-5.  But,

the Government does seek the ability to revise or supplement its Motion to address plaintiff's

negligent supervision claim.  *Id.* at 5.  Alternatively, the Government suggests dismissal under

Rule 12(b)(6), pointing to the Court's remark in its Motion to Dismiss ruling that "this is not a

case in which the Government allegedly failed to respond to the employee's misconduct."  ECF

14 at 22.  For her part, Neal expressly agrees that "no additional discovery is needed with regards

to the negligent supervision case," and asks that the Court permit the Government to file a

supplemental summary judgment motion regarding negligent supervision, and set a briefing schedule.  ECF 50 at 7-8.

   None of the arguments in the Motion are affected by the revival of plaintiff's negligent supervision claim.   With respect to the Government's argument as to causation and expert testimony, the Maryland Court of Special Appeals has noted: "Critically, the elements of negligent supervision are identical to the elements of a general negligence claim."  *Marrick Homes LLC v. Rutkowski*, 232 Md. App. 689, 709, 161 A.3d 53, 65 (2017); *see also Jones v. State*, 425 Md. 1, 18, 38 A.3d 333, 343 (2012) ("[T]he tort of negligent selection, training, or retention, like any negligence action, requires the plaintiff to prove the existence of four elements: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff suffered actual injury; and (4) the injury proximately resulted from the defendant's breach."); *Fidelity First Home Mortg. Co. v. Williams*, 208 Md. App. 180, 198, 56 A.3d 501, 511 (2012) ("As in any action for negligence, a plaintiff asserting a cause of action for negligent supervision or retention must prove duty, breach, causation, and damages.").  Thus, there does not appear to be any reason as to why my conclusions regarding the necessity of expert testimony to establish causation, *supra*, would not also hold true in the negligent supervision context.

   As to my ruling regarding plaintiff's failure to substantiate economic damages, this logic applies globally to plaintiff's claims, including negligent supervision.  And, the issues regarding plaintiff's intrusion upon seclusion claim are irrelevant to the negligent supervision claim.

   Accordingly, I shall grant the parties 30 days from the date of docketing of this Memorandum Opinion and the accompanying Order to  move for summary judgment as to the revived claim of negligent supervision.  Responses and replies shall follow according to the ordinary schedule.  *See* Local Rule 105.2.

## V.      Conclusion

For the aforementioned reasons, I shall grant the Motion in part and deny it in part.

In particular, I will grant summary judgment to the Government as to any claims relating to the following injuries, for both Count 1 and Count 2: the exacerbation of plaintiff's Crohn's disease; the effects of this exacerbation, including severe chronic fatigue syndrome and fibroids; serious gastrointestinal illness; worsening abdominal pain; the miscarriage; the lump in plaintiff's breast; neurological issues; short term memory issues; ear issues, including internal ear pain, itching, tinnitus, ringing ears, and discharge; general bodily illness; inconvenience and pain and suffering, insofar as they stem from these injuries; and marital difficulties.  I will also grant summary judgment to the Government as to plaintiff's claim for economic damages for both Count 1 and Count 2.  And, I will grant summary judgment to the Government as to the portion of Count 2 pertaining to Lewis's phone calls to Neal.

The Motion is denied as to plaintiff's claims for the following asserted injuries, for both Count 1 and Count 2: anxiety; panic attacks; sleeplessness; emotional injuries and distress; psychological trauma; paranoia; fearfulness; hopeleness ideations; depression and isolation; nightmares and flashbacks; embarrassment and humiliation; plaintiff's fear of Lewis stalking, harassing, or visiting her; and inconvenience and pain and suffering, insofar as they stem from these injuries.

Plaintiff's claim for noneconomic damages remains, except for the injuries for which summary judgment has been granted to the Government.

Count 2 (intrusion upon seclusion) remains, but only to the extent that the claim is not based upon Lewis's telephone calls to Neal.

66

      In addition, I will revive plaintiff's negligent supervision claim, and allow new summary judgment motions, due within 30 days.

      An Order follows, consistent with this Memorandum Opinion.


Date: February 8, 2022                                 _____/s/_____

                                          Ellen L. Hollander
                                        United States District Judge