**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

TIFFANY NEAL,                          *

Plaintiff,                             *

v.                                     *          Civil Action MJM 19-1033

UNITED STATES OF AMERICA,              *

Defendant.                             *

\* \* \* \* \* \* \* \* \* \*

<u>**MEMORANDUM OF DECISION**</u>

Plaintiff Tiffany Neal filed this civil action against the United States of America ("Defendant") under the Federal Tort Claims Act, 18 U.S.C. §§ 2671, *et seq.*, for claims arising from an outpatient visit to a medical facility operated by the United States Department of Veterans Affairs ("VA") in August 2017 and subsequent contacts with a VA employee. The claims remaining in this suit are professional negligence/vicarious liability, negligent supervision, and negligent breach of implied contract in Count 1 of the Complaint and intrusion upon seclusion in Count 2. ECF 1; ECF 71. Specifically, Ms. Neal, a female VA patient, alleges that a male electrocardiogram ("EKG") technician, without permission, walked in on her medical examination while she was partially disrobed and subsequently contacted her by phone. Ms. Neal claims that the tortious conduct of VA and the VA employee resulted in various emotional and psychological injuries for which she seeks an award of non-economic compensatory damages.[1]

---

[1] Summary judgment was entered in favor of Defendant on Ms. Neal's claims for economic damages and claims related to certain physical conditions. *See generally* ECF 52, 68; *Neal v. United States*, 599 F. Supp. 3d 270 (D. Md. 2022).

The parties appeared before the Court for a bench trial. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this memorandum sets forth the Court's findings of fact and conclusions of law based upon the evidence and testimony presented at trial.

## I.   <u>FINDINGS OF FACT</u>

### A.  Background

1.      Plaintiff Tiffany Neal is a female disabled military veteran who served actively from September 1999 through August 2004, when she was honorably discharged. Testimony of Tiffany Neal, December 1, 2022.

2.      At all times relevant to this action, Ms. Neal received medical services and treatment at the Baltimore Veterans Affairs Medical Center ("BVAMC"), a medical facility operated by VA in Maryland to provide medical care to veterans as part of the VA Maryland Health Care System ("VAMHCS"). Neal Test., Dec. 1, 2022.

### B.  Relevant BVAMC Policies

3.      BVAMC trained its employees on an annual basis on topics related to patient care. Testimony of Dr. Sandra Marshall, November 28, 2022; Testimony of Dr. Marc Hochberg, November 28, 2022; Testimony of Dr. Shawn Robinson, November 30, 2022.

4.      VAMHCS and BVAMC maintained a code of conduct policy for their employees that was operative at all times relevant to this action. Plaintiff's Exhibit 13; Defendant's Exhibit 2. The policy outlined responsibilities of VAMHCS employees related to "ethical conduct, relationships between Staff and Veterans, disruptive behavior, and inappropriate conduct." *Id.* at USA-00006.

5.      The code of conduct policy included a non-exhaustive list of appropriate employee behaviors such as treating people with respect and dignity, respecting veteran rights,

acting politely and professionally while on duty, respecting others' right to privacy, de-escalating volatile situations, safeguarding confidential and private information, and promptly reporting errors, mistakes, and violations of VA policies. Pl. Exh. 13; Def. Exh. 2.

6.     The code of conduct policy included a non-exhaustive list of prohibited disruptive behaviors, such as use of rude or disrespectful conduct or language, bullying or demeaning behavior, unwanted touching, sexual harassment, engaging in sexual activity while on duty, assaulting behavior, and accessing medical records without authorization. Pl. Exh. 13.

7.     VAMHCS and BVAMC had a "zero-tolerance" policy prohibiting patient abuse. Pl. Exh. 13; Def. Exh. 2. The policy defined "patient abuse" as "mistreatment or coercion of a Veteran or beneficiary during a hospital admission or during the delivery of outpatient care." *Id.* at USA-00008. Patient abuse included but was not limited to "acts of physical, psychological, verbal, sexual, emotional or financial nature by any employee (e.g., physical striking of a patient; threatening or intimidating behavior; crossing professional boundaries; insulting remarks toward or about a Veteran; abandonment; neglect; stealing from or taking financial or personal advantage of a Veteran)." *Id.* "Crossing professional boundaries" referred to "Professional Therapeutic Boundaries," which are described in the policy as limits on the personal relationship between a provider and client that "protect the space between the provider's power and the client's vulnerability." *Id.*, VAMHCS Policy Memorandum 512-00/PS-009, Attachment A. Abandonment and neglect of a patient referred to abandonment or neglect of a patient by an employee with responsibility for providing care to the patient. Hochberg Test. Nov. 28, 2022.

8.     BVAMC policies required any employee who witnessed patient abuse to report it to their supervisor. Pl. Exh. 13; Def. Exh. 2.

3

9.      Upon becoming aware of allegations of patient abuse, the supervisor was required, "[a]t a minimum," to "assign the alleged abuser to duties that do not involve the delivery of patient care to the alleged victim" and to "instruct the alleged abuser to avoid all contact with the alleged victim." Pl. Exh. 13, VAMHCS Policy Memorandum 512-00/PS-009 at 2; Def. Exh. 2.

10.     The code of conduct policy provided notice of BVAMC's progressive discipline practice, which aimed to correct employee conduct. The policy provided that "discipline or adverse action imposed will become more severe after each instance of substantiated misconduct." Pl. Exh. 13 at USA-00011; Def. Exh. 2.

11.     The progressive discipline practice began with recommendations for a change in behavior and admonishments. Under BVAMC disciplinary policies, "oral or written counselings of employees are not considered disciplinary actions, [but] such counselings may be considered when assessing the appropriate penalty for a particular offense." Pl. Exh. 13 at USA-04061.

12.     Progressive discipline at BVAMC was generally consistent with a "Table of Penalties," which served as "a guide in administering discipline to help assure that like disciplinary action is taken for like offense." Pl. Exh. 13 at USA-00011, 04060. Regarding patient abuse, the Table of Penalties provided a reprimand as a minimum penalty and removal as a maximum penalty for the first infraction, a 14-day suspension as a minimum penalty and removal as a maximum penalty for a second infraction, and removal for a third infraction. Pl. Exh. 13 at USA-04062.

13.     In addition to the Table of Penalties, certain mitigating and aggravating factors cited in *Douglas v. VA*, 5 M.S.P.R. 280 (1981) (the "*Douglas* factors") were considered to

determine the appropriate disciplinary action for employee misconduct. Pl. Exh. 13 at USA-04060; Marshall Test., Nov. 28, 2022.

14.     BVAMC disciplinary policies also provided for employees' due process. Before imposing discipline, such as a written reprimand or removal, an employee accused of misconduct was issued a notice of proposed reprimand or removal. The notice gave the employee an opportunity to contest allegations of misconduct by providing evidence in a written or verbal response. Marshall Test., Nov. 28, 2022; Hochberg Test., Nov. 28, 2022.

15.     BVAMC disciplinary policies provided that disciplinary actions "may be initiated when it has been substantiated that a Staff member committed an act of misconduct as outlined in the Code of Conduct." Pl. Exh. 13 at USA-00011; Def. Exh. 2. Under BVAMC disciplinary policies, "[a]ctions may be taken when it is evident that other supervisory techniques, such as verbal or written counseling[,] have failed to correct a given problem, or would be inappropriate given the severity of the misconduct." *Id.*

16.     If a complaint about an employee's conduct was received from a patient or another employee, it would be reviewed by the employee's supervisor. As necessary or appropriate, the supervisor would refer the complaint to BVAMC's Labor and Employee Relations department ("LER") for evaluation and investigation. LER would consider the seriousness of the conduct at issue and the employee's disciplinary history to determine whether disciplinary action was warranted. LER would meet with the employee's supervisor or head of the relevant clinical department and recommend further action. Marshall Test., Nov. 28, 2022; Hochberg Test., Nov. 28, 2022.

**C.  History of Workplace Misconduct by EKG Technician**

17.     VA hired Grant Lewis as an electrocardiogram ("EKG") technician in the Cardiology Section of BVAMC in September 1995. In addition to performing EKGs, Mr. Lewis performed stress tests, placed IVs in patients, placed halter monitors on patients, and scheduled appointments. Before his employment with BVAMC, Mr. Lewis spent eight years with the U.S. Navy Reserve and later worked for a private cardiology practice. Testimony of Grant Lewis, November 30, 2022.

18.     Mr. Lewis was a talented EKG technician and exceptionally skilled at reading EKGs and performing IVs on patients. Robinson Test., Nov. 30, 2022.

19.     At times relevant to this action, Mr. Lewis was directly supervised by Dr. Shawn Robinson, chief of the Cardiology Section at BVAMC. Dr. Robinson was responsible for ensuring that Mr. Lewis performed EKGs competently and made them available for review by attending physicians. Lewis Test., Nov. 30, 2022; Robinson Test., Nov. 30, 2022.

20.     Dr. Robinson supervised approximately twenty employees in the Cardiology Section, including technicians, nurse practitioners, post-doctoral fellows, and cardiologists, in addition to direct patient care responsibilities. Dr. Robinson reported to Dr. Marc Hochberg, and Dr. Hochberg reported to Dr. Sandra Marshall, chief of staff at BVAMC. Robinson Test., Nov. 30, 2022; Hochberg Test., Nov. 28, 2022.

21.     The normal administration of an EKG on a female patient required contact with the patient's breasts while the patient was partially disrobed. The lead that measures the electrical current must be placed in a space that generally falls underneath the breast, requiring the breast to be moved upward for the lead to be placed in the proper location. Def. Exh. 4; Hochberg Test., Nov. 28, 2022; Robinson Test., Nov. 30, 2022; Lewis Test., Nov. 30, 2022.

22.     In 2011, a female patient complained that Mr. Lewis's hand touched her nipple for approximately three seconds while he placed EKG leads on her chest. Def. Exh. 4; Def. Exh. 24 (sealed); Robinson Test., Nov. 30, 2022; Lewis Test., Nov. 30, 2022.

23.     BVAMC investigated the patient's claims. In January 2012, the Administrative Board of Investigation determined that Mr. Lewis violated the patient's dignity and privacy in failing to drape the patient at the time of the EKG and was "careless and insensitive" to the patient in violation of VA policy. Def. Exh. 4 at 1. The Board did not find that Mr. Lewis was purposefully disrespectful to the patient. *Id.* The Board concluded that the proper corrective action was for Mr. Lewis to participate in sensitivity training in the care of female veterans and that Mr. Lewis and other Cardiology staff be trained in alternative methods of EKG lead placement to avoid nipple contact. *Id.* at 2.

24.     Dr. Robinson subsequently met with Mr. Lewis to discuss protecting patient modesty while placing EKG leads on female veterans by allowing the patient to move her own breast or by using the back of the technician's hand to move the breast. Dr. Robinson also placed Mr. Lewis on restrictions to ensure that he conducted EKGs on female patients only in the presence of a female chaperone. The restrictions were memorialized in a written memo, which Mr. Lewis signed to affirm his understanding of the protocol and requirement of compliance. Pl. Exh. 40; Robinson Test., Nov. 30, 2022; Lewis Test., Nov. 30, 2022.

25.     As instructed by Dr. Robinson, Mr. Lewis used the back-of-the-hand placement method when conducting EKGs on female patients from that point forward. Lewis Test., Nov. 30, 2022.

26.     Between January 2012 and July 2015, Dr. Robinson did not receive any complaints against Mr. Lewis for inappropriate patient care. Robinson Test., Nov. 30, 2022.

27.     In 2015, Dr. Robinson became aware that a supply tech, Valerie Thomas, reported that she had chaperoned Mr. Lewis during two EKG procedures on female patients in August 2015, and Ms. Thomas felt that Mr. Lewis had left the patients' gowns open longer than necessary during the procedures. The patients involved did not submit complaints against Mr. Lewis or otherwise express discomfort with Mr. Lewis's conduct. Dr. Robinson asked Ms. Thomas to write a Report of Contact to document the incidents. When consulting Dr. Hochberg and LER about these allegations, Dr. Robinson opined that Mr. Lewis should be removed from treating both male and female patients due to the operational difficulties presented by his restrictions, lack of reliability, and potential risk to patient safety. Robinson Test., Nov. 30, 2022; Pl. Exh. 37; Pl. Exh. 42; Pl. Exh. 48; Pl. Exh. 74.

28.     On October 20, 2015, Mr. Lewis did not follow protocol and performed an EKG on a female patient without a chaperone. Mr. Lewis was familiar with the patient from prior visits to the Cardiology Clinic over the years. The patient told Mr. Lewis that she approved him performing the EKG without a chaperone. Lewis Test., Nov. 30, 2022; Robinson Test., Nov. 30, 2022.

29.     On October 20, 2015, nurse practitioner Deborah Lattimer-Pirales notified Dr. Robinson that she observed Mr. Lewis placing leads on a female veteran without a chaperone. At Dr. Robinson's request, Ms. Lattimer-Pirales executed a Report of Contact regarding the incident. She did not allege any sexually inappropriate conduct or complaints by the patient. Pl. Exh. 37; Pl. Exh. 73; Robinson Test., Nov. 30, 2022; Hochberg Test., Nov. 28, 2022.

30.     Dr. Robinson elevated the allegations about Mr. Lewis's conduct to Dr. Hochberg. The Human Resources and LER departments were also consulted. BVAMC

investigated the accusations against Mr. Lewis. Dr. Robinson gathered documentation to support

the investigation. Pl. Exh. 37; Robinson Test., Nov. 30, 2022; Hochberg Test., Nov. 28, 2022.

31.     BVAMC attempted to determine the identities of the patients involved in the

incidents reported by Ms. Thomas and the dates of the alleged incidents. Ms. Thomas could not

provide that information, and it could not otherwise be determined, which hampered BVAMC's

efforts to confirm the allegations and prevented it from taking disciplinary action for these

incidents. Pl. Exh. 37; Robinson Test., Nov. 30, 2022.

32.     LER recommended taking disciplinary action against Mr. Lewis based on the

October 20, 2015, incident reported by Ms. Lattimer-Pirales, for which BVAMC has sufficient

information to confirm Mr. Lewis's violation of prototcol. Pl. Exh. 37; Robinson Test., Nov. 30,

2022.

33.     Considering VA's progressive discipline practice and the lack of any prior formal

disciplinary action against Mr. Lewis, LER determined that the appropriate action was to have a

reprimand placed in Mr. Lewis's personnel file for failure to follow the chaperone protocol and a

restriction against Mr. Lewis performing EKGs on female patients with or without a chaperone.

Robinson Test., Nov. 30, 2022; Hochberg Test., Nov. 28, 2022.

34.     Accordingly, Mr. Lewis's restriction on performing EKGs on female patients was

escalated from requiring a female chaperone in the room to no longer performing EKGs on

female patients under any circumstances. Dr. Robinson informed Mr. Lewis's co-workers that

Mr. Lewis was not allowed to perform EKGs on female patients to secure their cooperation. Mr.

Lewis was still permitted to fit female patients with portable EKGs and to perform IVs on female

patients without a chaperone because these procedures did not require the patient to disrobe and,

according to Dr. Robinson, did not present a significant risk that Mr. Lewis's behavior would be

considered inappropriate. Pl. Exh. 37; Hochberg Test., Nov. 28, 2022; Robinson Test., Nov. 30, 2022; Lewis Test., Nov. 30, 2022.

35.     On January 19, 2016, Mr. Lewis was issued a written notice of proposed reprimand for failure to follow instructions due to the October 20, 2015, incident. Def. Exh. 10. The reprimand became final on February 3, 2016. Pl. Exh. 19. The reprimand put Mr. Lewis on notice that it would remain in his personnel file for at least six months and up to three years, and it could "be used in determining an appropriate penalty if further infractions occur." *Id.* at USA-00067.

36.     BVAMC did not receive any further allegations of inappropriate patient care by Mr. Lewis between February 2016 and August 2017. Robinson Test., Nov. 30, 2022.

37.     On August 3, 2017, BVAMC's Office of Risk Management made an inquiry to Dr. Robinson and Dr. Hochberg about Mr. Lewis's status based upon a Congressional report regarding the inappropriate contact Mr. Lewis had with a female patient in 2011. Dr. Hochberg's business manager and Dr. Robinson responded that Mr. Lewis was no longer performing EKGs on female patients and did not require any additional training on conducting EKGs. Pl. Exh. 59.

38.     Leteria Poole, an echocardiogram technician who began working in BVAMC's Cardiology Clinic in 2016, testified at trial that she saw Mr. Lewis with male and female patients in examination rooms where EKGs were performed. Testimony of Leteria Poole, November 29, 2022. However, Ms. Poole did not testify regarding what tasks or procedures Mr. Lewis was performing at those times, and she could not say that she witnessed Mr. Lewis conducting EKGs on female patients. No evidence was presented that Ms. Poole reported any misconduct by Mr. Lewis to Dr. Robinson or any other supervisor.

39.     Vanessa Julia, a police officer previously employed with VA Police at BVAMC, testified at trial that Mr. Lewis had performed an EKG on her "many years" before her testimony. Testimony of Vanessa Julia, November 30, 2022. Officer Julia testified that she felt uncomfortable when, while partially disrobed, Mr. Lewis placed leads on her chest, and she believed that Mr. Lewis left her exposed longer than necessary. *Id.* It is unclear when these events occurred, whether Mr. Lewis was under any restrictions at the time, and, if any, what restrictions were in force at the time. No evidence was presented that Officer Julia reported inappropriate conduct by Mr. Lewis to anyone at the time it allegedly occurred.

**D.  Plaintiff's Encounters with EKG Technician**

40.     On August 7, 2017, Ms. Neal visited BVAMC's Cardiology Clinic with her husband for a routine ultrasound and echocardiogram/sonogram procedure after experiencing unexplained chest pains. Neal Test., Dec. 1, 2022; Poole Test., Nov. 29, 2022.

41.     Ms. Neal encountered Mr. Lewis in the waiting room and asked him for directions to the bathroom. Mr. Lewis directed Ms. Neal to the bathroom. Neal Test., Dec. 1, 2022; Lewis Test., Nov. 30, 2022. Ms. Neal was with her husband at the time she spoke with Mr. Lewis. ECF 100 at 11; Lewis Test., Nov. 30, 2022.

42.     After Ms. Neal returned to the waiting room, echocardiogram technician Leteria Poole escorted Ms. Neal from the waiting room to the examination room to conduct her echocardiogram. Neal Test., Dec. 1, 2022; Poole Test., Nov. 29, 2022.

43.     There were signs on the door to the examination room providing notice that a procedure was being conducted inside the room and instructing patients to knock on the door upon their arrival to the waiting room. Poole Test., Nov. 29, 2022.

44.     The examination room contained two patient examination tables with two curtains so that a curtain could be pulled to hide from view the area surrounding each table for patient privacy. Poole Test., Nov. 29, 2022; Lewis Test., Nov. 30, 2022; Neal Test., Dec. 1, 2022.

45.     These privacy curtains were used to protect patient privacy and modesty while providing patient care. The curtains were to be closed to protect the patient from the view of persons not directly involved in her care while undergoing an examination that may require her to be disrobed or partially disrobed. Hochberg Test., Nov. 28, 2022.

46.     Inside the examination room, an echocardiogram machine more than five and a half feet in height was located near the head of an examination table, between the table and the door to the examination room. Poole Test., Nov. 29, 2022; Lewis Test., Nov. 30, 2022; Neal Test., Dec. 1, 2022.

47.     When the privacy curtain was pulled closed, a person entering the room could not see the table, echocardiogram machine, or anyone at either location behind the curtain. Poole Test., Nov. 29, 2022; Lewis Test., Nov. 30, 2022; Neal Test., Dec. 1, 2022.

48.     Ms. Poole gave Ms. Neal a gown, asked her to disrobe from the waist up, as was required for the procedure, and pulled the privacy curtain closed. Ms. Neal removed her shirt and bra, remained clothed from the waist down, and put on the gown. The gown opened in the front but could be pulled closed to cover the patient's breasts. Poole Test., Nov. 29, 2022; Neal Test., Dec. 1, 2022.

49.     The examination room was dimly lit during the procedure, the only light coming from Ms. Poole's computer screen and the echocardiogram machine. During the procedure, Ms. Neal was lying on the examination table with the privacy curtain closed. Poole Test., Nov. 29, 2022; Lewis Test., Nov. 30, 2022; Neal Test., Dec. 1, 2022.

50.     Mr. Lewis walked into the examination room during the procedure while knocking on the door but without waiting for a response to the knock before beginning to speak to Ms. Poole. Mr. Lewis entered the room to inform Ms. Poole that a phone call the clinic had received from another patient regarding an echocardiogram was resolved. Poole Test., Nov. 29, 2022; Lewis Test., Nov. 30, 2022.

51.     Mr. Lewis pulled the privacy curtain open several inches to look behind the curtain and make eye contact with Ms. Poole while speaking to her. The end of the curtain Mr. Lewis pulled open was near the head of the examination bed where Ms. Neal was lying and the echocardiogram machine where Ms. Poole was located. Mr. Lewis stood at least approximately an arm's length from Ms. Neal's head on the examination bed. Mr. Lewis was looking at Ms. Poole while he was speaking. Poole Test., Nov. 29, 2022; Lewis Test., Nov. 30, 2022.

52.     Mr. Lewis was unaware that a female patient was in the examination room and would not have opened the curtain if he had known that a female patient was there. Lewis Test., Nov. 30, 2022.

53.     Ms. Neal's husband was not in the waiting room at the time. Lewis Test., Nov. 30, 2022. No evidence was presented at trial to explain why he was not present at that time.

54.     Mr. Lewis did not see Ms. Neal initially because the room was mostly dark, he was looking at Ms. Poole, and the height of the bed was below his eye-shot. Ms. Neal spoke up and complained about Mr. Lewis entering the examination room, at which point Mr. Lewis realized that a female patient was present and apologized. Mr. Lewis stated that he thought a male patient was being examined with an apologetic tone. Ms. Neal asked Mr. Lewis, "Don't you see me laying here with my titties out? Do I look like a man to you?" Poole Test., Nov. 29, 2022; Lewis Test., Nov. 30, 2022; Neal Test., Dec. 1, 2022.

55.     Ms. Neal's breasts were not exposed at the time because they were covered by the gown she was wearing and by a towel Ms. Poole placed over her chest. Poole Test., Nov. 29, 2022; Lewis Test., Nov. 30, 2022.

56.     Mr. Lewis completed his message to Ms. Poole, closed the privacy curtain, and left the examination room. He had opened the curtain for less than a minute in total before closing it upon his departure. Poole Test., Nov. 29, 2022; Lewis Test., Nov. 30, 2022; Neal Test., Dec. 1, 2022.

57.     Mr. Lewis notified the BVAMC Patient Advocate's office that the patient he just encountered might submit a complaint about their interaction. Lewis Test., Nov. 30, 2022.

58.     Following her interaction with Mr. Lewis, Ms. Neal experienced shock, embarrassment, indignity, anxiety, and anger. Neal Test., Dec. 1, 2022.

59.     After Mr. Lewis left the examination room, Ms. Neal asked Ms. Poole whether Mr. Lewis would usually enter the room in that manner, and Ms. Poole responded that Mr. Lewis would sometimes come in during procedures to assist her. Upon Ms. Neal's request, Ms. Poole provided Mr. Lewis's name and contact information for Mr. Lewis's supervisor, Dr. Robinson. Poole Test., Nov. 29, 2022.

60.     After Ms. Poole completed Ms. Neal's echocardiogram, Ms. Neal dressed and exited the examination room. Ms. Neal's husband was waiting for her outside the room. Ms. Neal and her husband went to the Patient Advocate's office and reported Ms. Neal's encounter with Mr. Lewis to patient advocate Morris Ricks. Ms. Neal appeared emotionally distraught to Mr. Ricks and was tearful during their meeting. Testimony of Morris Ricks, November 29, 2022; Neal Test., Dec. 1, 2022.

14

61.     Ms. Neal reported to Mr. Ricks that Mr. Lewis opened the privacy curtain during her echocardiogram while her breasts were exposed and, during an exchange of words, told Ms. Neal that she did not look like a female. Pl. Exh. 23; Ricks Test., Nov. 29, 2022; Neal Test., Dec. 1, 2022.

62.     The incident was referred to Dr. Robinson and VA Police, and Detective Walter Jenkins was assigned to investigate the matter. Detective Jenkins interviewed Ms. Neal. Pl. Exh. 15; Pl. Exh. 23; Ricks Test., Nov. 29, 2022.

63.     At the time Ms. Neal met with Mr. Ricks and Detective Jenkins, she was experiencing and exhibiting emotional distress. Ricks Test., Nov. 29, 2022; Neal Test., Dec. 1, 2022.

64.     Detective Jenkins investigated Ms. Neal's complaint, interviewed Mr. Lewis and Ms. Poole, and prepared a report. The police report was provided to BVAMC for further action. Pl. Exh. 15; Robinson Test., Nov. 30, 2022.

65.     Mr. Lewis and Ms. Poole provided written statements about the incident to VA Police that were included in the police report and separate written statements provided to Dr. Robinson. Pl. Exh. 15; Pl. Exh. 56; Def. Exh. 17.

66.     During the investigation, BVAMC removed Mr. Lewis from patient care and assigned him administrative duties away from the Cardiology Clinic and under different supervision. Pl. Exh. 15; Pl. Exh. 16; Def. Exh. 7; Robinson Test., Nov. 30, 2022; Lewis Test., Nov. 30, 2022.

67.     Mr. Lewis was not instructed to avoid contact with Ms. Neal. Lewis Test., Nov. 30, 2022.

15

68.     Mr. Lewis's duties while on temporary administrative detail involved scheduling patient appointments. Pl. Exh. 16; Def. Exh. 7. Mr. Lewis was provided with a list of patients with telephone numbers to call to schedule stress tests, and one of the patients on the list he was provided was Ms. Neal. Lewis Test., Nov. 30, 2022.

69.     Mr. Lewis called Ms. Neal on August 10, 2017, to schedule her for a stress test. During the phone call, Mr. Lewis and Ms. Neal discussed the stress test and how the procedure would be conducted. ECF 100 at 11; Neal Test., Dec. 1, 2022; Lewis Test., Nov. 30, 2022.

70.     Lowering his voice to sound inoffensive, Mr. Lewis eventually told Ms. Neal that he was the person she had accused of misconduct at the Cardiology Clinic. Mr. Lewis and Ms. Neal then discussed the August 7, 2017, incident and Ms. Neal's complaint. Mr. Lewis apologized for the incident, and Ms. Neal accepted the apology. Neal Test., Dec. 1, 2022; Lewis Test., Nov. 30, 2022.

71.     Mr. Lewis's intention in addressing Ms. Neal's complaint during their phone call was to try to resolve the situation himself. Lewis Test., Nov. 30, 2022

72.     Ms. Neal told Mr. Lewis not to contact her again and hung up the phone. Mr. Lewis called her back twice after she hung up on him. Ms. Neal felt that Mr. Lewis was harassing her. Neal Test., Dec. 1, 2022.

73.     After Mr. Lewis's phone calls to Ms. Neal on August 10, 2017, Ms. Neal experienced feelings of distress, anger, fear, and anxiety. Ms. Neal testified that when she receives phone calls from phone numbers she does not recognize, she believes that Mr. Lewis may be the caller. Neal Test., Dec. 1, 2022.

74.     Mr. Lewis had no further contact with Ms. Neal after August 10, 2017, and Ms. Neal did not see Mr. Lewis again until he testified at trial in this case. Neal Test., Dec. 1, 2022; Lewis Test., Nov. 30, 2022.

75.     Ms. Neal reported her phone conversation with Mr. Lewis to the Patient Advocate's office and VA Police. ECF 100 at 12; Pl. Exh. 15; Ricks Test., Nov. 29, 2022; Neal Test., Dec. 1, 2022. Ms. Neal's allegations regarding the August 10, 2017, phone calls were reported to BVAMC leadership and LER and were included in the ongoing investigation of the August 7, 2017, incident. Pl. Exh. 15; Robinson Test., Nov. 30, 2022.

76.     Ms. Neal did not receive an immediate response after reporting that she had received phone calls from Mr. Lewis on August 10, 2017. She continued to call out of concern that VA may not take appropriate action to address the incident. Pl. Exh. 25; Neal Test., Dec. 1, 2022.

77.     After LER completed its investigation, it recommended that Mr. Lewis be removed from employment with VA. Hochberg Test., Nov. 28, 2022.

78.     On August 21, 2017, BVAMC issued Mr. Lewis a notice of proposed removal for conduct unbecoming of a federal employee. The proposed removal noted that factors considered in determining the penalty included Mr. Lewis's conduct on August 7, 2017; his conduct on August 10, 2017; the reprimand for failure to follow instructions that he received on January 20, 2016, regarding the treatment of a female veteran; and the memo dated January 25, 2012, that restricted his involvement in the treatment of female veterans. Pl. Exh. 17; Def. Exh. 6. With respect to the incident on August 7, 2017, Mr. Lewis's conduct was deemed "serious in that it infringed on the patient's privacy." *Id.* at USA-00034. Regarding the phone calls on August 10, 2017, Mr. Lewis's confrontation with Ms. Neal about her accusations was deemed "egregious"

and resulted in Ms. Neal expressing concerns for her safety. *Id.* The notice provided Mr. Lewis an opportunity to contest the proposed removal.

79.     BVAMC issued Mr. Lewis a decision of removal on September 7, 2017, with an effective date of September 15, 2017, for conduct unbecoming of a federal employee. During the period between the decision date and the effective date, Mr. Lewis was permitted an opportunity to appeal the decision. Def. Exh. 5; Marshall Test., Nov. 28, 2022.

80.     On September 8, 2017, Mr. Lewis resigned as "Resignation – ILIA," which indicates that Mr. Lewis resigned under proposed removal, and anyone calling to inquire regarding his employment with BVAMC would be informed that his removal was imminent at the time he resigned. Pl. Exh. 20 at USA-00169; Marshall Test., Nov. 28, 2022.

81.     Ms. Neal testified that, after her interactions with Mr. Lewis in August 2017, she developed severe anxiety, paranoia, fearfulness, hopelessness ideations, emotional trauma, depression, isolation from friends and family, and nightmares and flashbacks about Mr. Lewis's alleged harassment of her. Neal Test., Dec. 1, 2022.

82.     Ms. Neal received counseling at Johns Hopkins Health System between April 2020 and July 2020. No evidence was presented at trial regarding the purpose or content of this treatment apart from Ms. Neal's testimony that she began attending therapy as a result of her encounters with Mr. Lewis. Pl. Exh. 63; Neal Test., Dec. 1, 2022.

83.     Ms. Neal testified that concerns Mr. Lewis might show up at her home caused her to augment her home security system and, upon the advice of her therapist, to sell her house and move into a hotel. Neal Test., Dec. 1, 2022.

84.     Ms. Neal suffered from anxiety and posttraumatic stress disorder prior to the incident with Mr. Lewis on August 7, 2017. Neal Test., Dec. 1, 2022.

85.     Although Ms. Neal has continued to suffer from heart conditions, she has not

sought treatment from the BVAMC Cardiology Clinic since August 7, 2017, for fear that she

may run into Mr. Lewis. Ms. Neal continued to receive medical services at BVAMC after

August 7, 2017, including treatment for gastrointestinal ("GI") issues and Crohn's disease. Neal

Test., Dec. 1, 2022.

86.     During a visit to BVAMC's GI Clinic in 2020, Ms. Neal became visibly upset

when asked to disrobe for a medical procedure. In discussing the matter with BVAMC nurse

practitioner Terry Williams, Ms. Neal told Ms. Williams that an employee in the EKG

department had made inappropriate statements to Ms. Neal. Testimony of Terry Williams,

November 20, 2022.

**E.  Plaintiff's Credibility**

87.     Portions of Ms. Neal's trial testimony conflicted with the testimony of other

witnesses and with other evidence presented at trial. As explained further below, Ms. Neal

provided significant testimony that the Court does not find credible:

88.     At trial, Ms. Neal testified that, during the echocardiogram on August 7, 2017, her

gown was fully open, and her breasts were fully exposed. Neal Test., Dec. 1, 2022. Both Ms.

Poole and Mr. Lewis contradict this testimony. Ms. Poole testified that the gown Ms. Neal wore

covered her nipples and that Ms. Poole placed a towel over Ms. Neal's chest at the outset of the

procedure. Mr. Lewis testified similarly that, once he saw Ms. Neal on the examination table, he

saw that her gown was closed and that Ms. Poole placed a towel to cover Ms. Neal's chest. Poole

Test., Nov. 29, 2022; Lewis Test., Nov. 30, 2022. The Court credits the testimony of Ms. Poole

and Mr. Lewis on this issue over Ms. Neal's testimony.

89.     At trial, Ms. Neal testified that when Mr. Lewis entered the examination room and pulled the privacy curtain open, Mr. Lewis's penis was erect, and she felt his erect penis against her head. She testified further that she turned her head upward and saw Mr. Lewis standing directly above her but remained lying on the examination bed, where Mr. Lewis's penis remained on her head. Neal Test., Dec. 1, 2022. Ms. Neal's testimony is contradicted by Ms. Poole and Mr. Lewis, who testified that Mr. Lewis was standing at least two feet away from Ms. Neal's head and never touched Ms. Neal. Poole Test., Nov. 29, 2022; Lewis Test., Nov. 30, 2022. Furthermore, the undisputed fact that Mr. Lewis was busy addressing a work-related matter with Ms. Poole when he pulled the curtain makes it highly improbable that he was sexually aroused at the time. Ms. Neal's account is also undermined by the undisputed fact that she did not move from her position on the examination bed at any point during the incident. The Court finds Ms. Neal's testimony about Mr. Lewis's erect penis touching her head in the examination room implausible under the circumstances.

90.     There is no dispute that Ms. Neal did not complain to Ms. Poole or Mr. Ricks, or mention in her written statement to VA Police, that Mr. Lewis's erect penis touched her head or that he otherwise made physical contact with her. Ms. Neal testified at trial that she was emotionally distraught when she made these statements and inadvertently omitted mention of the alleged sexual assault. Neal Test., Dec. 1, 2022. Without more, the Court finds this explanation unpersuasive.

91.     Ms. Williams testified at trial that Ms. Neal did not mention having an erect penis placed on her when discussing the incident with Ms. Williams in 2020. Instead, according to Ms. Williams, Ms. Neal described the incident as a male employee having made inappropriate remarks to her in the EKG department. Williams Test., Nov. 20, 2022.

92.     Ms. Neal testified that she orally reported the alleged physical contact by Mr. Lewis to Detective Jenkins on August 7, 2017. There is no dispute, however, that Detective Jenkins's report makes no mention of any such allegation. Ms. Neal testified that this allegation was inexplicably omitted from the report. Pl. Exh. 15; Neal Test., Dec. 1, 2022. The Court finds that proposition dubious given the seriousness of the allegation and the detailed nature of the police report in every other respect. For example, the report reflects that Mr. Lewis contacted Ms. Neal by phone on August 10, 2017, and, on this basis, states that Detective Jenkins would "look into possible criminal charges of harassment by [Mr. Lewis]." Pl. Exh. 15 at 5. If Detective Jenkins was aware of the alleged sexual harassment or potential sexual assault by Mr. Lewis—misconduct of greater seriousness than phone harassment—the Court would expect to find some reference to this accusation in the police report.

93.     At trial, Ms. Neal testified that Mr. Lewis said she looked like a man during their encounter on August 7, 2017, and Ms. Neal was offended by this comment. Neal Test., Dec. 1, 2022. Ms. Poole and Mr. Lewis each testified that Mr. Lewis made no such comment. Poole Test., Nov. 29, 2022; Lewis Test., Nov. 30, 2022. Ms. Neal probably misinterpreted Mr. Lewis's statement that he thought a male patient was in the examination room as an insult about Ms. Neal's appearance. The Court credits the consistent testimony of Ms. Poole and Mr. Lewis on this issue over Ms. Neal's testimony.

94.     At trial, Ms. Neal testified that her husband was not with her when she first encountered Mr. Lewis in the waiting room on August 7, 2017, and requested directions to the restroom. Neal Test., Dec. 1, 2022. In advance of trial, the parties stipulated that Ms. Neal's husband was with her at the time, ECF 100 at 11, and Mr. Lewis testified accordingly at trial, Lewis Test., Nov. 30, 2022. Ms. Poole also testified that a man who came into the clinic with

Ms. Neal remained in the waiting room when Ms. Neal entered the examination room. Poole

Test., Nov. 29, 2022. Considering the corroboration of Mr. Lewis's testimony by Ms. Poole, the

Court credits the testimony of Mr. Lewis on this issue over Ms. Neal's testimony. While not

critical to the Court's assessment of the facts of this case, the presence of a man in the waiting

room area at the time Mr. Lewis first encountered Ms. Neal tends to support Mr. Lewis's

testimony that he did not know a female patient was in Ms. Poole's examination room when he

entered it. Having observed Ms. Neal's husband in the waiting room may have led Mr. Lewis to

believe that the same man was the patient in the examination room when Mr. Lewis later entered

the room, considering that most of the Cardiology Clinic's patients were male.[2]

95.     Ms. Neal testified that, while at BVAMC's GI Clinic with nurse practitioner Terry

Williams in 2020, she became hysterical when she was required to disrobe for a procedure,

which brought about memories and feelings from Mr. Lewis's conduct. Ms. Williams testified

that Ms. Neal appeared bothered by the need to disrobe and told Ms. Williams that a male

technician had previously made inappropriate statements to her. According to Ms. Williams, Ms.

Neal did not exhibit any response akin to hysteria or a panic attack. Williams Test., Nov. 30,

2022; Neal Test., Dec. 1, 2022. Given Ms. Neal's lack of credibility about the events of August

7, 2017, the Court credits the testimony of Ms. Williams over Ms. Neal's conflicting testimony.

## II.     CONCLUSIONS OF LAW

### A.  Vicarious Liability for Professional Negligence

1.     Ms. Neal asserts a claim of professional negligence based upon Mr. Lewis's

conduct on August 7, 2017, and August 10, 2017, for which Defendant is vicariously liable.

---

[2] Dr. Robinson estimated that, between 2012 and 2017, only approximately ten percent of patients in the Cardiology Clinic were female. Robinson Test., Nov. 30, 2022; *see also* Marshall Test., Nov. 28, 2022.

2.     To establish negligence under Maryland law, the plaintiff must prove by a

preponderance of the evidence: "(1) that the defendant was under a duty to protect the plaintiff

from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury

or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the

duty." *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 212-13, 60 A.3d 1, 10

(2013) (emphasis and citation omitted).

3.     A professional "is held to the standard of care that prevails in his or her

profession." *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 226 Md. App.

420, 438, 130 A.3d 1024, 1034 (Ct. Spec. 2016).

4.     In Maryland, a plaintiff "may invoke the doctrine of respondeat superior as a

means of holding an employer, corporate or otherwise, vicariously liable for the tortious conduct

of an employee, where it has been shown that the employee was acting within the scope of the

employment relationship at that time." *Southern Mgmt. Corp. v. Taha*, 378 Md. 461, 480-81, 836

A.2d 627, 638 (2003). "For an employee's tortious acts to be considered within the scope of

employment, the acts must have been in furtherance of the employer's business and authorized

by the employer." *Id.* at 481. An act taken incidentally to the performance of the work duties

may be deemed within the scope of employment, even when in opposition to the employer's

express orders. *Sawyer v. Humphries*, 322 Md. 247, 255, 587 A.2d 467, 470 (1991). However,

"where an employee's actions are personal, or where they represent a departure from the purpose

of furthering the employer's business, or where the employee is acting to protect his own

interests, even if during normal duty hours and at an authorized locality, the employee's actions

are outside the scope of employment." *Id.* at 256–57. And where the employee's conduct is

"unprovoked, highly unusual, and quite outrageous, courts tend to hold that this in itself is

sufficient to indicate that the motive was a purely personal one and the conduct outside the scope of employment." *Id.* at 257 (internal quotation marks and citation omitted).

5.      Ms. Neal has established that Mr. Lewis's professional duties as a BVAMC employee included protecting the privacy and modesty of patients under the care of BVAMC— at least to the extent that this duty did not interfere with the provision of patient care or the performance of other work duties. Pl. Exh. 13; Robinson Test., Nov. 30, 2022.

6.      The purpose served by privacy curtains was to protect patient privacy and modesty while providing patient care. Dr. Hochberg testified that medical professionals are trained to pull privacy curtains closed when examining a patient and that a closed privacy curtain should not be opened without first obtaining permission. Hochberg Test., Nov. 28, 2022. It is apparent from this testimony that a prevailing professional standard of care required that the privacy curtain be used to protect the patient from the view of persons not directly involved in her care while undergoing an examination that may require her to be disrobed or partially disrobed. The curtain was not to be opened without the consent of the patient or without medical need.

7.      Ms. Neal has established by a preponderance of the evidence that Mr. Lewis, a person not directly involved in the care of Ms. Neal, breached his duty on August 7, 2017, by opening the privacy curtain in the examination room for no purpose other than to make eye contact with Ms. Poole while conversing with her, and did so without first obtaining the permission of Ms. Poole or Ms. Neal. Poole Test., Nov. 29, 2022; Lewis Test., Nov. 30, 2022; Neal Test., Dec. 1, 2022. The privacy curtain was being used to protect Ms. Neal from view during her echocardiogram procedure, which required her to disrobe partially. Although Mr.

Lewis had a legitimate work-related reason to speak with Ms. Poole when he pulled open the privacy curtain, he did not need to open the curtain to speak with Ms. Poole.

8.      Mr. Lewis's conduct was incidental to the performance of his work duties and within the scope of his employment. He had entered the examination room to convey information to Ms. Poole that the needs of another patient had been resolved and that no further action was required of Ms. Poole. Poole Test., Nov. 29, 2022; Lewis Test., Nov. 30, 2022. Mr. Lewis did not enter the examination room and pull open the privacy curtain for personal reasons. Therefore, Defendant is vicariously liable for any damages proximately caused by Mr. Lewis's entry to the examination room and opening of the privacy curtain.

9.      As explained *supra*, the Court does not credit Ms. Neal's allegation that Mr. Lewis's erect penis contacted Ms. Neal's head after the privacy curtain was opened. Even if this allegation were true, Mr. Lewis's conduct would have been personal in nature and beyond the scope of his employment. Therefore, the United States could not be held vicariously liable for this assaultive conduct, and the Court would lack subject matter jurisdiction of any tort claim against the United States based upon vicarious liability for this conduct. *See* ECF 14 at 16; *Neal v. United States*, 2019 WL 6341622, at *8 (D. Md. Nov. 27, 2019).

10.     For the foregoing reasons, the Court finds Defendant vicariously liable for any damages resulting from Mr. Lewis's entry into the examination room and opening of the privacy curtain on August 7, 2017. The Court will address the matter of causation and damages in Section II.D. *infra*.[3]

### B.  Direct Liability for Negligent Supervision

---

[3] The Court does not need to address whether Mr. Lewis's phone calls to Ms. Neal on August 10, 2017, separately constituted an actionable breach because, for reasons explained in Section II.B. *infra*, the Court finds Defendant directly liable for any injuries proximately caused by Mr. Lewis's phone calls to Ms. Neal.

11.     Ms. Neal asserts a claim against Defendant for negligent supervision of Mr. Lewis based upon BVAMC's alleged failure to comply with VA policies in its response Mr. Lewis's conduct on August 7, 2017, and prior findings of workplace misconduct by Mr. Lewis. Ms. Neal contends that a proper response to Mr. Lewis's prior misconduct would have resulted in Mr. Lewis's removal from patient care and prevented the incident that occurred on August 7, 2017. She contends further that a proper response to the incident on August 7, 2017, would have prevented Mr. Lewis from contacting Ms. Neal on August 10, 2017.

12.     To prove negligent supervision under Maryland law, the plaintiff must establish "that her injury was caused by the tortious conduct of [an employee], that the employer knew or should have known by the exercise of diligence and reasonable care that the [employee] was capable of inflicting harm of some type, that the employer failed to use proper care in . . . supervising . . . that employee, and that the employer's breach of its duty was the proximate cause of the Plaintiff's injuries." *Bryant v. Better Business Bureau of Greater Maryland, Inc.*, 923 F. Supp. 720, 751 (D. Md. 1996) (citing *Evans v. Morsell*, 284 Md. 160, 165, 395 A.2d 480, 483 (1978)).

13.     A plaintiff may assert a claim of negligent supervision against the United States under the FTCA for failing to comply with a mandatory policy bearing on the supervision of a federal employee. *Lins v. United States*, 847 F. App'x 159, 166 (4th Cir. 2021).

14.     As explained further below, the Court does not find that BVAMC failed to comply with any mandate prescribed by VA policy in its response to findings of workplace misconduct by Mr. Lewis that preceded the events of August 7, 2017. However, the Court concludes that BVAMC breached a duty it owed to Ms. Neal in failing to instruct Mr. Lewis not

to contact her and by assigning him the task of contacting her by phone while an investigation of his conduct on August 7, 2017, was pending.

BVAMC's Response to Incidents Involving Mr. Lewis Before August 7, 2017

15.     The VA's progressive discipline practice permitted BVAMC to impose counseling aimed at correcting employee behavior and called for more severe disciplinary action and penalties with each subsequent substantiated instance of misconduct.

16.     In 2012, Mr. Lewis was counseled for an incident with a female patient that occurred in 2011. BVAMC found that Mr. Lewis violated patient's dignity and privacy and was careless and insensitive to the patient while conducting an EKG procedure during which the patient alleged that Mr. Lewis made brief contact with her nipple. Mr. Lewis was also placed on the restriction of having a female chaperone when conducting EKGs on female patients. In addition, Mr. Lewis and other Cardiology staff members were trained in alternative methods of lead placement. These measures were taken to avoid and correct any misconduct by Mr. Lewis and were consistent with BVAMC's progressive discipline practice.

17.     No evidence was presented at trial of any earlier findings of misconduct by Mr. Lewis.

18.     Even if Mr. Lewis's conduct in 2011 rose to the level of patient abuse under VA's code of conduct policy, the Table of Penalties presented at trial provided for a reprimand as a minimum penalty for a first infraction. Exh. 13 at USA-04062.[4] BVAMC was not under an obligation to terminate Mr. Lewis's employment based on the 2011 incident, and Ms. Neal could

_____

[4] The Court notes that this portion of the Table of Penalties is dated July 19, 2013, well after the incident in 2011.

not have been harmed in 2017 by any failure of BVAMC to reprimand formally Mr. Lewis for the 2011 incident.

19.     No allegations of similar misconduct by Mr. Lewis were substantiated until October 2015 when Mr. Lewis was observed by another employee performing an EKG on a female patient without a chaperone, as required at the time. Notably, the patient did not allege any misconduct by Mr. Lewis, and there was no evidence that his conduct rose to the level of patient abuse. In response to Mr. Lewis's violation of protocol, BVAMC imposed a formal reprimand on him, placed the reprimand in Mr. Lewis's personnel file, and prohibited Mr. Lewis from conducting EKGs on female patients under any circumstances. These measures reflected BVAMC's assessment of the *Douglas* factors, were taken to avoid and correct any misconduct by Mr. Lewis, and, consistent with BVAMC's progressive discipline practice, were a more severe disciplinary action than the non-punitive counseling Mr. Lewis received in 2012 for the 2011 incident.[5]

20.     No allegations of similar misconduct by Mr. Lewis while conducting patient care were substantiated until August 7, 2017 when Mr. Lewis walked in on Ms. Neal's echocardiogram procedure.

21.     Ms. Neal has failed to establish by a preponderance of the evidence that BVAMC violated any mandatory policy or breached any duty owed to her in its supervision of Mr. Lewis before August 7, 2017.

---

[5] Dr. Robinson, Dr. Hochberg, and their staff consulted LER in October 2015 after receiving reports that Mr. Lewis had recently behaved inappropriately while performing EKGs on unidentified female patients. Robinson Testimony, Nov. 30, 2022; Pl. Exh. 42. During this consultation, Dr. Robinson expressed an opinion that Mr. Lewis should be removed from patient care. However, the female patients involved in these alleged incidents were never identified and never submitted any complaints about Mr. Lewis's conduct, and the allegations were never substantiated. BVAMC could not be expected to remove Mr. Lewis from patient care based upon unsubstantiated reports of misconduct.

BVAMC's Response to the August 7, 2017, Incident

22.     Following her encounter with Mr. Lewis on August 7, 2017, Ms. Neal reported to the Patient Advocate's office and then to VA Police that Mr. Lewis had walked in on her echocardiogram procedure, pulled open the privacy curtain, and conversed with Ms. Poole. According to Ms. Neal, she confronted Mr. Lewis about his conduct and complained that he was present while her breasts were exposed. Ms. Neal alleged that Mr. Lewis stated that he thought Ms. Neal was male or did not know that Ms. Neal was female. When Ms. Neal asked Mr. Lewis whether she looked like a male, according to Ms. Neal, Mr. Lewis responded that she looked like a male, insulting her appearance, and then left the examination room after further discussion with Ms. Poole.

23.     According to Ms. Neal's reports to the Patient Advocate and VA Police on August 7, 2017, Mr. Lewis's conduct constituted patient abuse within the meaning of VA's patient abuse policy. Under that policy, patient abuse includes verbal mistreatment of a veteran during the delivery of outpatient care and includes "insulting remarks toward or about a Veteran[.]" Pl. Exh. 13 (USA-00008); Def. Exh. 2. According to Ms. Neal's allegations, Mr. Lewis had made an insulting remark about Ms. Neal's appearance and had verbally disrespected and mistreated her.[6]

24.     The Court notes that Mr. Lewis's conduct on August 7, 2017, as reported by Ms. Neal on that date, did not constitute the crossing of professional boundaries, abandonment, or neglect within the meaning of VA's patient abuse policy. Mr. Lewis was not involved in

---

[6] Dr. Marshall, Dr. Hochberg, and Dr. Robinson each testified that they did not believe Ms. Neal's allegations about what occurred on August 7, 2017, constituted allegations of patient abuse under the definition of patient abuse set forth in the policy. Marshall Test., Nov. 28, 2022; Hochberg Test., Nov. 28, 2022; Robinson Test., Nov. 30, 2022. The Court disagrees with this assessment for reasons explained herein.

providing care to Ms. Neal and, therefore, could not have abandoned or neglected her within the meaning of the policy. Mr. Lewis did not exceed the proper limits on any personal relationship with Ms. Neal such that he crossed a professional boundary because he had no personal relationship with Ms. Neal to speak of. However, according to Ms. Neal's allegations, Mr. Lewis did level insulting remarks toward Ms. Neal while she was receiving services at BVAMC, constituting patient abuse.

25.     Mr. Lewis's supervisor, Dr. Robinson, was aware of Ms. Neal's allegations. Dr. Robinson knew or should have known that, if allowed to contact Ms. Neal directly, Mr. Lewis could have discussed Ms. Neal's allegations against him and thereby caused her further distress and anxiety. According to Dr. Robinson's trial testimony, it was obvious that Mr. Lewis should not contact Ms. Neal after she accused him of misconduct. Robinson Test., Nov. 30, 2022. In its subsequent notice of proposed removal to Mr. Lewis, BVAMC deemed Mr. Lewis's phone calls confronting Ms. Neal about her allegations "egregious." Pl. Exh. 17 at USA-00034.

26.     In response to Ms. Neal's accusation of patient abuse, VA's patient abuse policy required Mr. Lewis's supervisor, "[a]t a minimum," to assign Mr. Lewis to duties not involving care to Ms. Neal and to instruct Mr. Lewis "to avoid all contact with" Ms. Neal. Pl. Exh. 13, VAMHCS Policy Memorandum 512-00/PS-009 at 2; Def. Exh. 2.

27.     Mr. Lewis was temporarily assigned administrative duties in response to Ms. Neal's allegations and removed from patient care, but Mr. Lewis was not told to avoid contact with Ms. Neal.[7] To the contrary, Mr. Lewis was tasked specifically with contacting Ms. Neal, among other patients, about the unrelated matter of scheduling a stress test.

---

[7] The Court recognizes that, in his police report, Detective Jenkins stated that he had instructed Mr. Lewis to avoid contact with Ms. Neal. Pl. Exh. 15 at 3. On this point, however, the report is hearsay and cannot be credited over Mr. Lewis's testimony that he was not instructed to avoid contact with Ms. Neal. Lewis Test., Nov. 30, 2022. In any event, there can be no dispute that Detective Jenkins is not Mr. Lewis's

28.     As explained in Section I.E. *supra*, the Court does not credit Ms. Neal's testimony that Mr. Lewis actually made a rude and insulting comment about Ms. Neal's appearance. But Ms. Neal had reported to BVAMC and VA Police that such a comment was made. Given the nature of this allegation, Mr. Lewis's supervisor was obligated to comply with the temporary measures prescribed by the patient abuse policy until the truth of Ms. Neal's complaints could be determined.

29.     In failing to comply with the patient abuse policy in its supervision of Mr. Lewis in August 2017, BVAMC breached a standard of care owed to Ms. Neal as the victim of Mr. Lewis's alleged patient abuse and is liable for any injuries to Ms. Neal proximately caused by that breach. The Court will address the matter of causation and damages in Section II.D. *infra*.

### C.  Liability for Negligent Breach of Implied Contract

30.     Ms. Neal asserts a claim against Defendant for negligent breach of an implied contract to maintain the confidentiality of Ms. Neal's medical information.

31.     Ms. Neal has failed to establish any breach of the duty to protect her private medical information by BVAMC or by Mr. Lewis. No evidence of a breach or injuries resulting from any such breach was presented at trial.

32.     Therefore, judgment shall be entered in favor of Defendant on Ms. Neal's claim for negligent breach of implied contract.

### D.  Causation and Damages

33.     Having found Defendant liable for Mr. Lewis's professional negligence on August 7, 2017, and for negligent supervision of Mr. Lewis between August 7 and August 10,

---

supervisor, and it was Mr. Lewis's supervisor whom VA policy made responsible for advising him to avoid contact with Ms. Neal. Mr. Lewis's supervisor at the time, Dr. Robinson, testified that he did not recall instructing Mr. Lewis not to contact Ms. Neal. Robinson Test., Nov. 30, 2022.

2017, the Court must address whether the negligent conduct of either Mr. Lewis or Defendant on those dates was a proximate cause of harms suffered by Ms. Neal.

34.     "Negligence is not actionable unless it is a proximate cause of the harm alleged." *Stone v. Chicago Title Ins. of Md.*, 330 Md. 329, 337, 624 A.2d 496, 500 (1993). In Maryland, "[t]o be a proximate cause for an injury, the negligence must be 1) a cause in fact, and 2) a legally cognizable cause." *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 429, 56 A.3d 170, 195 (2012) (internal quotation marks and citation omitted).

35.     When "only one negligent act is at issue[,]" causation-in-fact may be found if "the injury would not have occurred absent or 'but for' the defendant's negligent act." *Pittway Corp. v. Collins*, 409 Md. 218, 244, 973 A.2d 771, 786-87 (2009). When an injury is the result of "two or more independent negligent acts[,]" causation-in-fact may be found "if it is 'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Id.*

36.     Determining whether the defendant's negligence is a legally cognizable cause of the plaintiff's injury involves "considerations of fairness or social policy as well as mere causation." *Peterson v. Underwood*, 258 Md. 9, 16, 264 A.2d 851, 855 (1970). "The question of legal causation most often involves a determination of whether the injuries were a foreseeable result of the negligent conduct[,]" *Pittway*, 409 Md. at 246, 973 A.2d at 778, that is, whether the actual harm "falls within a general field of danger that the actor should have anticipated or expected[,]" *id.* at 245. To determine legal causation, the court may consider "the remoteness of the injury from the negligence [and] the extent to which the injury is out of proportion to the negligent party's culpability[.]" *Id.* at 246 (citation omitted). The test of foreseeability is "intended to reflect current societal standards with respect to an acceptable nexus between the

negligent act and the ensuing harm, and to avoid the attachment of liability where . . . it appears 'highly extraordinary' that the negligent conduct should have brought about the harm." *Henly v. Prince George's Cnty.*, 305 Md. 320, 334, 503 A.2d 1333, 1340 (1986) (citation omitted).

37.     Mr. Lewis's entry into the examination room and look behind the privacy curtain where Ms. Neal's echocardiogram was being conducted on August 7, 2017, caused shock, embarrassment, indignity, anxiety, and anger in Ms. Neal. These emotional responses manifested in the visible appearance of emotional distress and tearful crying when Ms. Neal reported the incident to the Patient Advocate and VA Police the day it occurred. The Court finds that Ms. Neal's emotional distress would not have occurred if Mr. Lewis had not entered the examination room and opened the privacy curtain without permission. Mr. Lewis's conduct on August 7, 2017, was at least a substantial factor in causing the emotional distress suffered by Ms. Neal.

38.     Mr. Lewis would not have placed phone calls to Ms. Neal on August 10, 2017, if his supervisors had instructed him not to contact Ms. Neal, as required by VA's patient abuse policy, and had not assigned him the task of calling Ms. Neal.

39.     Mr. Lewis's phone calls to Ms. Neal on August 10, 2017, caused further anxiety, anger, and fear in Ms. Neal. Mr. Lewis's conduct on August 10, 2017, was at least a substantial factor in causing the emotional distress suffered by Ms. Neal.

40.     The incidents involving Mr. Lewis on August 7 and August 10, 2017, have proven to have some lasting effects on Ms. Neal's life. Years after the incident, in 2020, Ms. Neal continued to exhibit some emotional distress from the incidents when discussing them with Ms. Williams. The incidents on August 7 and August 10, 2017, have also prevented Ms. Neal from feeling secure enough to remove her clothing for purposes of a medical procedure at

BVAMC's GI Clinic in 2020 and prevented Ms. Neal from seeking treatment for ongoing heart conditions at BVAMC's Cardiology Clinic since August 2017.

41.     The foregoing emotional distress exhibited by Ms. Neal and the foregoing impacts on her life were reasonably foreseeable results of Mr. Lewis's conduct on August 7 and August 10, 2017. These injuries fall within the general field of danger that Mr. Lewis should have anticipated from violating a patient's privacy during a medical procedure in the manner that occurred on August 7 and, days later, confronting the patient about accusations she had made about that privacy violation. BVAMC should have also expected or anticipated that Mr. Lewis may discuss the August 7 incident and Ms. Neal's complaints with her if placed in a position to contact her personally and that harm to Ms. Neal could have resulted from such an interaction. BVAMC's and Mr. Lewis's negligence were therefore legally cognizable causes of the foregoing harms suffered by Ms. Neal.

42.     The Court will therefore enter judgment against Defendant and in favor of Ms. Neal on her claims of professional negligence and negligent supervision.

43.     The Court will award $5,000 in compensatory damages for the foregoing harms suffered by Ms. Neal that resulted from Mr. Lewis's tortious conduct on August 7 and August 10, 2017, and BVAMC's negligent supervision of Mr. Lewis during that period. These harms include emotional distress, inconvenience, and disruption in Ms. Neal's willingness to disrobe for medical procedures and to receive treatment from BVAMC's Cardiology Clinic for continuing heart conditions. The Court concludes that the foregoing award is sufficient to account for the magnitude and lingering influence of Ms. Neal's emotional distress and inconvenience. The Court expects that Ms. Neal can overcome and circumvent these challenges and that the effects of the August 2017 events will continue to diminish with time.

44. Ms. Neal testified that, since the events of August 7 and 10, 2017, she has suffered and continues to suffer far greater harms, including severe anxiety, paranoia, hopelessness ideations, insomnia, depression, and isolation from friends and family, and that she has received therapy for her mental condition about two and a half years after the incidents. These injuries are significantly out of proportion to Mr. Lewis's and BVAMC's culpability for their negligent conduct toward Ms. Neal in August 2017. In summary, Mr. Lewis looked behind a privacy curtain for less than a minute in a dimly lit room where Ms. Neal was partially disrobed and, a few days later, contacted Ms. Neal by phone, discussed the incident with her in a calm manner, and apologized. That Mr. Lewis's conduct should cause in Ms. Neal severe psychological injuries and social isolation is highly extraordinary. Even if Mr. Lewis's conduct was a but-for cause or significant factor in any severe psychological harm suffered by Ms. Neal, it would not be a legally cognizable one without some medical or scientific explanation. No expert testimony was presented at trial to support a causal connection between the events of August 2017 and the psychological and social impacts Ms. Neal claims to have suffered.

45. To be clear, Ms. Neal did not testify that her alleged psychological injuries resulted solely from Mr. Lewis opening the privacy curtain and later calling her to discuss the incident. As noted above, she testified that, after entering the examination room, Mr. Lewis's penis was erect, that it made contact with her head, and that it remained there while Mr. Lewis conveyed a message to the technician conducting Ms. Neal's procedure and then made offensive remarks about Ms. Neal's appearance. It is indeed plausible that such brazen and shocking physical and verbal abuse would result in severe psychological injuries. But the Court does not find that Mr. Lewis ever touched or insulted Ms. Neal. Even if Mr. Lewis's penis made physical contact with Ms. Neal as she alleges, the Court lacks subject matter jurisdiction of any claim of

vicarious liability against the United States based upon any sexual assault or harassment by Mr. Lewis. The Court cannot award damages on any such claim because Mr. Lewis's alleged conduct would have been personal in nature and exceeded the scope of his employment. *See* ECF 14 at 16; *Neal*, 2019 WL 6341622, at *8.

46.     The Court recognizes the possibility that severe and persistent psychological injuries may have resulted from a combination of Ms. Neal's encounters with Mr. Lewis on August 7 and 10, 2017, and the preexisting mental disorders she suffered at the time of these encounters. It is possible that Ms. Neal's preexisting clinical anxiety and posttraumatic stress disorder made her especially sensitive or susceptible to severe psychological injury from even minor invasions of privacy or that conduct akin to Mr. Lewis's would tend to aggravate Ms. Neal's preexisting conditions. However, the evidence presented at trial is inadequate to support a conclusion that Mr. Lewis's conduct was more likely than not a cause or substantial factor in Ms. Neal's severe clinical psychological condition and need for therapy two and a half years after Mr. Lewis's conduct. Such a conclusion is far from obvious. It would require the Court to address complicated medical and scientific questions that the trial evidence does not prepare the Court to answer. The Court is not equipped to answer these questions on its own without resorting to guesswork and conjecture, and the Court cannot rely upon guesswork and conjecture.

47.     For the foregoing reasons, no compensatory damages will be awarded for the severe psychological and social injuries Ms. Neal claims resulted from Defendant's negligence.

48.     Compensatory damages of $5,000 will be awarded for the non-severe emotional distress and inconveniences endured by Ms. Neal as a proximate result of Defendant's negligence. That such injuries may result from the sort of privacy violation suffered by Ms. Neal

is within common knowledge and experience and does not require scientific or medical explanation.

### E. Intrusion Upon Seclusion

49.     Finally, Ms. Neal asserts a claim against Defendant for intrusion upon seclusion based upon Mr. Lewis's conduct on August 7, 2017, and accessing Ms. Neal's medical records.

50.     Intrusion upon seclusion is a tort recognized in Maryland law as a form of invasion of privacy. *See, e.g.*, *Bailer v. Erie Ins. Exch.*, 344 Md. 515, 525-27, 687 A.2d 1375, 1380-81 (1997); *Harleysville Preferred Ins. Co. v. Rams Head Savage Mill, LLC*, 237 Md. App. 705, 725, 741, 187 A.3d 797, 808, 818 n.11 (Ct. Spec. App. 2018). To establish liability for intrusion upon seclusion, the plaintiff must prove intentional intrusion, "physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns" in a manner that "would be highly offensive to a reasonable person." *Bailer*, 344 Md. at 526 (quoting Restatement (Second) of Torts § 652B (1977)); *see also Harleysville Preferred Ins.*, 237 Md. App. at 725. The elements of this tort are (1) an intentional (2) "intrusion or prying upon" (3) something that is private or "entitled to be private" (4) in a manner that is "highly offensive to a reasonable person, considering the customs of the time and place. . . ." Maryland State Bar Association, *Maryland Civil Pattern Jury Instructions*, 25:1 cmt. A.3 (5th ed. 2021) (citations omitted). "[P]ublic disclosure is not an element of the offense." *Id.* In assessing liability for invasion of privacy, "rea[s]onableness under the facts is the determining factor." *Beane v. McMullen*, 265 Md. 585, 601, 291 A.2d 37, 45 (1972). "There is . . . no liability unless the interference with the plaintiff's seclusion is a substantial one. . . ." Restatement (Second) of Torts § 652B cmt. d. "The tort cannot be committed by unintended conduct amounting merely to lack of due care." *Bailer*,

344 Md. at 527, 687 A.2d at 1381 (quoting *Snakenberg v. Hartford Cas. Ins. Co.*, 299 S.C. 164, 174, 383 S.E.2d 2, 7 (S.C. Ct. App. 1989)).

51.     The echocardiogram on August 7, 2017, required Ms. Neal to disrobe above the waist and lie down on an examination bed. Measures were taken to protect her privacy and modesty, including wearing a gown, having her chest covered by a towel, and closing the privacy curtain. In these circumstances, the Court finds that Ms. Neal had a reasonable expectation that her echocardiogram would be conducted in privacy. By entering the room and pulling the privacy curtain open without permission, Mr. Lewis intruded upon Ms. Neal's seclusion.

52.     However, the Court does not find that Mr. Lewis's intrusion was substantial or that it would be highly offensive to an ordinary reasonable person. The intrusion was minor. Mr. Lewis opened the privacy curtain for less than a minute and only wide enough to make eye contact with the echocardiogram technician, Ms. Poole. The room was dimly lit. Mr. Lewis did not even see Ms. Neal until she spoke up to complain about his presence. Even then, Ms. Neal's breasts were not exposed to Mr. Lewis, as they were covered by the gown she wore and the towel Ms. Poole placed over her. Ms. Neal was clothed from the waist down.

53.     The Court is mindful of the context of Mr. Lewis's intrusion: an examination room in a medical facility—a setting in which it is expected as a matter of practice and custom that a patient will compromise her privacy interests to some degree for the sake of receiving medical treatment. Mr. Lewis was an employee with patient care responsibilities and was therefore not out of place in the examination room. His objective in entering the room and opening the curtain was to communicate with another employee—not to invade a patient's privacy. Mr. Lewis's lack of due care is insufficient to establish liability for intrusion upon seclusion under Maryland law.

38

54.     Regarding Ms. Neal's claim that Mr. Lewis intruded upon her seclusion by accessing her medical records, no evidence was presented at trial that Mr. Lewis ever accessed any private medical information about Ms. Neal.

55.     Because Ms. Neal has failed to establish critical elements of her claim for intrusion upon seclusion, the Court will enter judgment in favor of Defendant on this claim.

### III.     CONCLUSION

For the reasons stated in this memorandum, the Court will enter a judgment in favor of plaintiff Tiffany Neal and against defendant United States of America on the claims for professional negligence and negligent supervision in Count 1 of the Complaint and award compensatory damages in an amount of $5,000. Judgment will be entered in favor of Defendant on the remaining claims in Count 1 and on Count 2. A separate order will follow.


                                        _____/S/_____
Date: January 23, 2023                  Matthew J. Maddox
                                        United States Magistrate Judge